38 N.J. Super. 468 (1955)
119 A.2d 461
ROCKAWAY ESTATES, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
ROCKAWAY TOWNSHIP, A MUNICIPAL CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 1955.
Decided December 27, 1955.
*470 Before Judges CLAPP, JAYNE and FRANCIS.
*471 Mr. Aaron W. Nussman argued the cause for the appellant (Mr. George I. Marcus, attorney).
Mr. R. Wayne Stickel argued the cause for the respondent (Messrs. Matthews & James, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
In this action in lieu of prerogative writ plaintiff sought a judgment establishing the invalidity of the zoning ordinance of Rockaway Township, Morris County, New Jersey. The attack was predicated primarily on the allegation that the ordinance as a whole was invalid because it was not adopted pursuant to a reasonable, comprehensive plan for the creation of zones designed to accomplish the orderly development of land use. Secondly, it was contended that the zone classification of plaintiff's land was unreasonable and discriminatory and amounted to spot zoning. The trial court sustained the ordinance as a valid exercise of municipal power. This appeal followed.
Some factual background is necessary to the proper consideration of the matter.
Rockaway Township consists of an area of 45.3 square miles. It is basically a rural community with hilly and mountainous terrain. Three villages and three lake developments known as White Meadow, Lake Telemark and Green Pond are situated within the township. The year-round population, according to the 1940 census was 2,423; by the 1950 census it was 4,418. In 1954 the estimated all-year population was 6,350 and 9,800 in the summer. There is no sanitary sewer system except in a small area adjacent to the Town of Dover.
Prior to March 18, 1954 no zoning ordinance had ever been adopted. In March 1951 a zoning commission, composed of the local citizenry, was appointed to study the problem. The record is plain that before the professional planning consultants were engaged the commission had made substantial progress, zones had been decided upon, tentatively at least, a zoning map had been drawn and the text of the ordinance had been prepared.
*472 On July 15, 1953 plaintiff, a developer and builder, acquired title to 341.90 acres in the township. Before the acquisition it knew that a zoning ordinance was in the formative stage and one of its representatives had met with the township committee, the school board and the zoning commission, in connection with its intention to purchase and subdivide the land for the building of one-family homes. The proposed project contemplated the construction of about 1,200 homes on lots 60 feet by 100 feet.
In January 1954 plaintiff submitted to the governing body a proposed subdivision of part of its land into lots of the size mentioned. The plan was turned over to the zoning commission.
In September 1953 the zoning commission began to consult with a firm of planning experts. The firm was actually engaged in January 1954 and worked both independently and with the commission through March 18, 1954, when the ordinance in question was enacted. The experts continued their study thereafter and were still occupied with it at the time of the hearing in this action.
There is no doubt that the presentation of plaintiff's proposed subdivision accelerated the activity on the part of the town officials toward the completion of the zoning process and the submission of the ordinance for adoption. However, the trial court found, and we agree, that the proof does not warrant a finding that the enactment was aimed solely at plaintiff's land or designed to discriminate against it arbitrarily. The testimony shows that the expert planners were not engaged primarily to draw the ordinance; they were to do a complete planning program for the community. The proposed development was discussed with them and they advised the township that if their study indicated that the location was a logical one for it, they would recommend it.
It does appear that the study of the planners would not be completed for at least two years, and some further revisions or refinements of the ordinance were in contemplation. But these facts of themselves should not militate against the legal efficacy of the ordinance so long as it meets *473 the requisites to validity hereafter discussed. Nor is it to be condemned merely because it was enacted hastily and to some extent as an interim measure to prevent a building project which would destroy aborning the effort to provide for the orderly land use development of the municipality. Cf. Guaclides v. Borough of Englewood Cliffs, 11 N.J. Super. 405 (App. Div. 1951).
In such a situation the action of the governing body should be viewed liberally and with sympathy, having in mind the important public objective sought to be achieved.
The essentials of a good zoning ordinance are prescribed by N.J.S.A. 40:55-32, as follows:
"Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality."
Upon approval by the municipal governing body the ordinance becomes invested with a presumption of validity and of conformity with the mandate of the statute. The person assailing it is burdened with the task of showing violation of the statute or that it is discriminatory in relation to his land or that the classifications created thereby are arbitrary or unreasonable. Scarborough Apartments, Inc. v. City of Englewood, 9 N.J. 182 (1952); Monmouth Lumber Co. v. Township of Ocean, 9 N.J. 64 (1952). It may be noted also that the municipal authorities, as legislative bodies, "may make such classifications as they deem necessary and as long as their classifications are based upon reasonable grounds `so as not to be arbitrary or capricious' they will not be upset by the courts." Pierro v. Baxendale, 20 N.J. 17 (1955). And so long as the use restrictions bear a reasonable relation to the health, safety, morals or general welfare of *474 the community, they will not be condemned. Collins v. Board of Adjustment of Margate City, 3 N.J. 200 (1949).
Plaintiff criticizes the ordinance as not being the product of a comprehensive plan. Examination shows that it covers and classifies in zones all of the land within the municipal borders. Five zones are created:
AA residence; for single family and agricultural use; minimum lot area of lots 40,250 square feet (approximately an acre), with an average width of 175 feet and 230 feet deep.
A residence; for single family residential use, including AA district use; minimum lot area 20,000 square feet, with average width 100 feet and depth of 200 feet.
B residence; for one and two family residential use, including A zone use; minimum lot area 6,000 square feet, with an average width of 60 feet for each single-family dwelling; minimum lot area of 8,500 square feet, with an average width of 85 feet for each two-family dwelling; depth of lots to be 100 feet.
C business; business uses of a strictly retail sales and service type; including residential construction which meets requirements of B residence zone; transient hotel, public restaurant or other eating place; retail stores, public garages, filling stations, offices, business schools, office buildings, bowling alleys, hotels, warehouses, etc.
D industrial; all business and industrial uses permitted in the Township; residential construction which meets all yard and density requirements of A zone; certain "nuisance" businesses are forbidden.
The height of buildings, size of front, side and rear yards are regulated in all districts.
Plaintiff's 341.90 acres are in the A residence district where the lot requirements are 100 feet by 200 feet.
Reference to the zoning map which is part of the ordinance reveals that the AA residence zone, where roughly one-acre lots are required, comprises one large area on the north and northeast perimeter of the township; it is essentially undeveloped and hilly land; the A residence sections, where roughly one-half acre lots are necessary and plaintiff's tract is located, are (1) on the south and southeast borders (four or five square miles), not built up except for a few scattered houses; (2) a smaller area about in the east central part of the township, also not developed to any extent; (3) an area larger than (1) in the northwest section adjoining the AA zone on the west and adjacent to the Green Pond area.
*475 It cannot be said from the zone lines as shown on the map that the classifications are arbitrary; the various districts appear to be set off from each other and fairly localized. The D industrial district does seem to extend over an unusually large, though substantially single area. The explanation is that a large segment of it, located on the extreme western border is a government reservation containing the Piccatinny Arsenal and a Navy Depot; another large area in the east and north of the reservation is mining land where mining operations are being conducted. Use of the surface of these mining lands for residence purposes is one of the problems still under study by the experts. They felt that the large surface area should be used for homes on an acre-lot basis and that this departure from their usual practice of prohibiting residence use in industrial zones was warranted by the unusual conditions. However, the municipal authorities decided upon the lot requirement of the A zone, that is roughly a half-acre, and the ordinance was drawn that way. The recommendation, however, still remains that this large surface area should be classified in an agricultural-residential zone with one-acre lot minimums, and subsurface mining operations continuing as a permitted use. In this respect, the ordinance may be revised.
Our review of the testimony shows that the municipal planners (whose qualifications were impressive) with the assistance of the zoning commission and the advantage of the preliminary work done by it, undertook township-wide planning for land use. We are satisfied also that the ordinance as prepared and adopted is the product of a comprehensive plan to regulate such use. Cf. Guaclides v. Englewood Cliffs, supra, at 412. Moreover, in our view the plan is comprehensive not only because the physical partition into zones appears to be reasonable but also because that partition in its broadest aspects portrays reasonable planning for the orderly development of the community in the future. See Haar, In Accordance with a Comprehensive Plan, 68 Harv. L. Rev. 1154 (1955). That the ordinance at the moment *476 does not represent the ultimate refinements of the planning is not ground for invalidation.
A quotation from one of the witnesses on the subject is illuminating:
"Well, I think I have pointed out there is enough room in the small lot zones to accommodate a population of almost twice the present population, so we have enough land set aside within our small lot areas to accommodate that population that wants to build on small lots in Rockaway Township for the next twenty or thirty years. I don't believe there is any question in anyone's mind that there certainly is enough land within this some thirty-five square miles excluding the government property for people who want to build on acre lots or larger. There is enough land within the business zones, as they were adopted, to increase their business use by five hundred percent. There certainly is enough land zoned for industry to let any kind of industry come in here that wants to that is not objectionable as evidenced by the zoning map, which puts over half of the township in the industrial zone.
So I believe that recognizing the existing conditions as they did exist at the time this ordinance was prepared, we have set aside enough land within each one of these zones to accommodate any kind of future development."
In explaining the 20,000-square-foot lot area requirement for A zone, he said:
"The basic reason, your Honor, we know we have forty-five square miles in Rockaway Township, of which thirty is for practical purposes developable land or land not under the jurisdiction of the federal government. We also know we have approximately six thousand year around residents, and if we grow to two or two and a half times the present population within the planning period of twenty to thirty years we know how much land twelve to fifteen thousand people will need. So that we set up our small lot zones with the idea that there are enough people within these service areas or small lot districts at the present time to justify the kind of urban services that they will eventually have to have because of the density of the development in there on sixty foot lots. They will have to have sewers in there either now or eventually they will have to have them.
They should have schools within walking distance and police protection and fire protection and garbage protection, which is most economical for the municipality to provide. So instead of letting sixty foot lots or eighty foot lots or one hundred foot lots go any place in this area which might result in Lake Telemark in the center, some other development similar on the north and one over *477 to the east, you would have all of these concentrated developments scattered throughout this thirty miles which, in our opinion, would bankrupt the municipality. But we are saying that we know approximately how many people we have to accommodate. Let's accommodate them in areas that are the most economical to serve to the municipality.
We are not saying or we never have said, or the Zoning Commission never has said, we want to curb small lot development in the township. They have said and they are saying it through their zoning ordinance that we have a place for small lots to grow so they can be most economically served, and anyone that comes in there with a hundred, two or five hundred homes within a small lot zone can build there and meet these small lot zoning requirements."
Plaintiff charges that the economic reasons spoken of by the witness were the sole basis for the ordinance. We cannot agree. These reasons were, of course, a substantial factor but not the exclusive factor. So long as such grounds exist for zoning as are demanded by the statute, there is no sound objection to the consideration of cost of municipal services in the establishment of the zones. As Justice Heher said in Collins v. Board of Adjustment of Margate City, supra, at 209:
"A high class residence district is as essential to the local economy as multi-family and apartment house areas. Each has its place in a well-rounded municipal development; each has its part in a comprehensive plan for the utilization of local facilities for the common welfare. The devotion of lands to their highest and best uses, having in view the needs of all, is the principle of zoning as expounded in the statute. The complex problems of communal life and growth lay corresponding restraints upon the use of property; and, if the measures invoked are reasonably adapted to the need, there is not a taking of property in the constitutional sense."
See also Greenway Homes v. River Edge, 137 N.J.L. 453, 456 (Sup. Ct. 1948).
We find nothing to support the contention that placing plaintiff's large tract in the A zone constitutes discrimination and spot zoning. Inclusion of almost 342 acres representing what one witness described "a very small portion of a large area that is bigger than many of our New Jersey cities," in the same zone as the large area, can hardly be characterized as spot zoning.
*478 The core of plaintiff's opposition is really that the lot size requirement prevents the most profitable use of his land. But the welfare of the community for all time cannot be subordinated to the profit motive of an individual landowner. Scarborough Apartments, Inc. v. City of Englewood, supra, 9 N.J., at page 186; Guaclides v. Englewood Cliffs, supra, 11 N.J. Super., at page 415.
A number of approved examples of more restrictive zoning and land use than we have here are referred to in Pierro v. Baxendale, supra. Of particular relevance is Fischer v. Township of Bedminster, 11 N.J. 194 (1952), cited therein, where a five-acre lot requirement was sustained "on the primary ground that there was `ample justification for the ordinance in preserving the character of the community, maintaining the value of property therein and devoting the land throughout the township for its most appropriate use.'"
On the whole case, in our opinion, this ordinance is reasonably designed to further the advancement of the township as a social, economic and political unit and therefore serves the general welfare as a proper exercise of the zoning power. Lionshead Lake, Inc. v. Township of Wayne, 10 N.J. 165, 172 (1952), appeal dismissed 344 U.S. 919, 73 S.Ct. 386, 97 L.Ed. 708 (1953).
The judgment is affirmed.