41 N.J. Super. 47 (1956)
124 A.2d 54
EDMUND B. CLARY, PLAINTIFF-APPELLANT,
v.
THE BOROUGH OF EATONTOWN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 4, 1956.
Decided July 10, 1956.
*51 Before Judges FREUND, CONFORD and SCHETTINO.
Mr. Merritt Lane, Jr., argued the cause for plaintiff-appellant (Messrs. McCarter, English & Studer and Mr. Eugene M. Haring, attorneys).
Mr. Lawrence A. Carton, Jr., argued the cause for defendant-respondent (Messrs. Roberts, Pillsbury & Carton, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
This is an appeal from a judgment of the Superior Court, Law Division, sustaining the validity, as against the plaintiff, of a zoning ordinance adopted by *52 the defendant borough November 10, 1954. The ordinance effects widespread revision of residential zoning throughout the municipality, principally by creating a scale of zones based upon minimum lot area and frontage. Some 58 acres of undeveloped land owned by plaintiff were placed in an R-3 residential zone, which requires a minimum lot area of 20,000 square feet and a 100-foot minimum frontage. The gravamen of the action is plaintiff's assertion that such a restriction on his property is unreasonable; that the character of most existing homes in the neighborhood and the size of the lots on which they are situated are such that it would be economically unfeasible to develop his property for residences on lots as large as 20,000 square feet and that the effect of the ordinance upon his property is consequently confiscatory.
Plaintiff also complains of the effect of the ordinance in restricting the utility of ten small building lots which he owns in what is known as the Chestnut Grove development, northwest of the 58-acre tract. These lots were placed by the ordinance in an R-4 residence zone calling for a minimum lot area of 11,000 square feet and a minimum frontage of 75 feet. The complaint is that the ordinance is unreasonable as to these properties because none of them can conform with all the requirements as to frontage, land area and side yard area.
Eatontown is a municipality of some six square miles in area, having a 1955 population of approximately 5,000. It is situated in Monmouth County, a part of the State which is experiencing rapid population growth, much of it through mass small-home residential developments. In 1940 its population was only 1,700, and in 1950 approximately 3,000. About one third of its land area is vacant and unused, except for occasional farming operations. The community may be described as primarily made up of middle class residents, homes having a value of over $20,000 being exceptional. Much, if not most, of the working population is employed either at nearby Fort Monmouth, the Eisner uniform plant at Red Bank, or at the Bendix plant on State Highway No. *53 35, which was erected within the last five years. The municipality is bisected in a north-south direction by State Highway No. 35 and east-west by State Highway No. 36. These highways, an approach spur to the Garden State Parkway, and two other thoroughfares have their confluence at what is generally known as the Eatontown Traffic Circle, situated at the geographical center of the municipality.
Wyckoff Road, a county highway, almost intersects the borough in a northeast-southwest direction, crossing both State Highways No. 35 and No. 36 about 1,000 feet northwest of the Eatontown Circle. The plaintiff's 58-acre tract (hereinafter referred to as the Clary tract) is situated on Wyckoff Road, being a rough rectangle whose southeasterly corner on Wyckoff Road is approximately four-tenths of a mile from its conjunction with State Highway No. 35. Its northeasterly corner on Wyckoff Road is approximately 1,500 feet from the connection of that thoroughfare with Broad Street, a state highway, also known as Eatontown Boulevard, which runs thence in a westerly direction on a bend and meets Route 35 at the business center of the town approximately a mile and a quarter from Wyckoff Road and Broad Street. Immediately north of the Clary tract and abutting Broad Street are two tracts of farm land known as the Maida property, aggregating approximately 30 acres. The easterly parcel lies in the angle of the Wyckoff Road-Broad Street corner. Between the Maida tracts is situated a small residential development known as Stillman Park. The Clary and Maida properties, together with a triangular area of some 40 acres lying on the east side of Wyckoff Road, with a frontage thereon opposite the Clary-Maida tracts of almost 2,000 feet, were assembled in the zoning ordinance to constitute a single 130-acre contiguous R-3 residence zone district. The triangular piece last mentioned is bounded on the southeast by Reynolds Drive, which abuts a golf course, and is partly developed with a few homes on lots large enough to comply with the R-3 zoning requirement. This is the only R-3 zone district in the half of the borough north of State Highway No. 36, that part of the municipality in *54 which its main business district lies and in which most of its population is settled. There is one other small R-3 zone district in the northwest corner of the borough, adjacent to the Borough of New Shrewsbury, and two large R-3 zone districts in the southerly half of the borough, one of these being bisected by Wyckoff Road and coming to within about 300 feet of the Eatontown traffic circle, the other situated in the southeasterly corner of the borough, adjacent to West Long Branch. There are two residence zones under the ordinance calling for larger minimum lot areas than the R-3 zone. These are the R-2 residence zone, calling for a minimum lot area of 32,000 square feet and a minimum frontage of 150 feet, and the R-1 residence zone, requiring a minimum lot area of one acre, with a minimum frontage of 200 feet. One of the R-2 zone districts is constituted by the golf course aforementioned, immediately east of the R-3 zone district in which the Clary property lies. There is another large R-2 zone district in the southeasterly segment of the borough, and there are two very substantial R-1 zone districts in the westerly part of the borough, bordering Shrewsbury Township.
The main thrust of plaintiff's attack upon the zone classification of the Clary property is bottomed upon the existence of five developments northeast, northwest and south of the property comprised of smaller residence plots. Most emphasis has been placed by plaintiff's witnesses on what is known as the Elkwood development, a 52-acre tract lying across Wyckoff Road east of the Maida property and bounded on the north by Broad Street and Monmouth Road. This consists of 193 small, ranch-type houses, most of which are on plots of 75 x 100 feet, some having garages and others not. This development was begun in 1950 and completed in 1954, and the average house and garage therein sold for $13,500. The most recent sales of some of these properties have been at about $14,500. Plaintiff concedes that these homes are attractive. Immediately east of the Elkwood development is a small group of better residences on larger lots, described as the Stirrup Lane development. One of plaintiff's real *55 estate experts estimated these homes to have a value of from $14,000 to $18,000. They were described as the homes of business executives. This development juts into the golf course aforementioned but is within plain sight of the Elkwood homes.
Immediately north of Broad Street and across the street from the Maida properties and Stillman Park is the Monmouth Park development. This consists of 77 houses on varying sized plots, most of which have frontages of 50 or 60 feet. There are, however, 16 houses on lots having frontages of 100 feet or greater. Most of the lots are 7,000 square feet in area. A real estate expert for plaintiff estimated the average value of the homes in Monmouth Park to be $12,500, but said that there were some which in his opinion were worth $16,000.
The Stillman Park development referred to previously as lying between the two Maida tracts and immediately north of the Clary tract consists of an attractive group of some 18 homes based upon a circle. Those of the plots which are built upon vary in acreage from 7,800 square feet to 51,000 square feet. In addition to the largest improved plot, there is one other substantially in excess of 20,000 square feet, and others ranging from 16,000 to 20,000 square feet, all improved with homes. The four homes within the circle are on plots of 14,300 square feet. Two other plots immediate contiguous to the Clary property are substantially in excess of 20,000 square feet but are not improved by homes, apparently because the terrain is too low. Plaintiff's realty expert values the homes in Stillman Park at from $14,500 to $15,000 but concedes that two of them are worth considerably more.
Northwest of the Clary and Maida properties is the Chestnut Grove development mentioned above. Most of this area has not yet been built upon. The lots which have been improved with homes, however, average 7,500 square feet in area. Plaintiff's expert gave them an average value of $12,000. Screening the Clary tract from Chestnut Grove is a heavy growth of trees and shrubbery.
*56 Immediately south of the Clary tract is a 150-foot vacant strip of land described by the municipal representatives as a buffer zone. South of that is the development known as Norwood Homes, lying on three streets which branch off from Wyckoff Road. These comprise 65 homes, of similar structure, erected on plots varying from 6,600 square feet to 8,900 square feet. These, too, are described by plaintiff as attractive.
In addition to the argument based upon the smallness of the homes and lots in surrounding developments plaintiff contends that a factor further militating against the utility of the Clary tract for better-type homes is the unattractiveness of each of the road approaches to the property. He stresses that the highways which lead to the Wyckoff Road approach on the south have the usual highway appurtenances of gasoline stations, trailer camps, diners, and miscellaneous business establishments; that an approach from the north, via Broad Street, involves traversing the unattractive commercial center of the town on Broad Street. Finally, his argument dwells upon the consideration that Eatontown is predominantly composed of working-class people living in small dwellings and that they characterize the kind of prospect interested in an Eatontown home. The central theme of plaintiff's case is that it is not economically feasible to develop the Clary tract for residence purposes on lots of 20,000 square feet because a lot of that area would require a home of such value that the parcel would sell for of $20,000 to $25,000, a product assertedly not marketable in Eatontown under the surrounding developmental circumstances. It is contended, in effect, that the reasonable residential zoning of Eatontown must be approached from the standpoint of its modest status in the surrounding geographical region  that the requirements of the region for better homes are adequately met by such nearby communities as Rumson, Fair Haven, Little Silver, and the Shrewsburys, which are characterized by higher-cost residential areas.
One realty expert for plaintiff, McGregor, who had sold most of the Elkwood homes, testified that land in the neighborhood *57 was worth $1,000 a quarter-acre and that a house which "would be put on a 20,000 square foot lot" on the Clary tract, "where the land would sell for $1,000 a quarter of an acre," would be "at least $20,000, maybe $25,000." He did not believe any developer would undertake the development of the Clary tract on that basis and testified he knew of builders who had lost interest in the property after it was rezoned. He conceded, on cross-examination, however, that the fact that he might not be able to sell the property for that type of development "doesn't mean a thing," that "somebody might do it," and that the plaintiff had never authorized him to sell the land to any one for any given price. He also conceded that he knew of instances in Monmouth County where homes in residential developments on lots of 100 x 200 feet had been sold for $16,000.
Another realty expert for plaintiff, Morris, testified that in his opinion, "on a lot 20,000 square feet there should be a house from $22,000 to $25,000," in order "to make it economically feasible." He did not think that it would be practicable to sell homes of that value on the Clary tract because of the proximity of the smaller homes in the Elkwood development. He acknowledged, however, that directly across Wyckoff Road from the Clary tract there were homes on plots in excess of 20,000 square feet which he would value at about $20,000.
Theodore McGinness, a member of the Eatontown Planning Board, clerk of the tax board, and engaged in the real estate business in Eatontown, was called as a witness by plaintiff, primarily to testify concerning assessment records. He testified that homes on 20,000 square foot plots in the Clary tract would not "readily sell" for from $20,000 to $25,000. Later, however, as a witness for the defendant, he stated it to be his opinion that the Clary tract could be developed on plots of 20,000 square feet for homes which would sell for from $16,000 to $18,000. He referred to two other residential developments on Wyckoff Road south of State Highway No. 36, on plots of 20,000 square feet, which were in process of development and selling at prices from $14,000 *58 to $21,000. He also testified to a projected "Wynnewood Homes Development," for which a plot plan had been officially approved, to be erected on the easterly side of Wyckoff Road southeast of the Clary tract and within the triangular portion of the R-3 zone district here in question. We gather from the transcript that the lots are about 20,000 square feet, but the plot plan, though admitted in evidence, has not been incorporated in the appendix.
Plaintiff produced as a witness Russell V.N. Black, a well-known zoning and planning expert, who gave it as his opinion that the zoning of the Clary property for minimum 20,000 square foot lots was "much too severe an up-grading" as against the surrounding homes on 7,500 square foot plots. His conclusion was that the zoning of the Clary tract in the respect mentioned was unreasonable. He said, however, that the "cost range of the houses" in the neighborhood is "really more determinative of the Clary tract than the actual size of the lots" of such houses. We judge this to mean that in his opinion the degree of "up-grading" of the subject tract should be measured in terms of comparison of the value of the homes in the surrounding area with that of such homes as might feasibly be projected for the Clary tract on lots of 20,000 square feet rather than in terms of comparison of the respective lot areas.
The plaintiff testified as a witness in his own behalf. He is a New York lawyer and has been beneficially interested in the Clary tract for some 20 years. It appears that the property was originally a hunting preserve on a large estate. It is on high ground, attractively landscaped with trees and shrubs and several brooks course through it. The plaintiff testified that he spends much of his time in keeping the property attractive. He said that he has had several inquiries concerning purchase of the property but that the prospects lost interest when told of the present zoning. He conceded, however, that he has never listed the property for sale nor communicated a sale price to any one. There is no evidence that he has ever attempted to market the property.
*59 The principal witness for the defendant was Leo J. Carling, president of the Eatontown Planning Board. The board was created by the municipality in the spring of 1950 and undertook at once a comprehensive study of the borough for purposes of revision of the existing zoning of the municipality, then based upon an ordinance of 1940 which fixed no minimum lot areas for the residential zones. Carling himself became very active in planning activities statewide and later became a director of the New Jersey Federation of Official Planning Boards and of the Central Jersey Federation of Planning Boards. He has made an extensive study of the current literature in the field and has attended various lectures and conferences on planning and zoning held in New Jersey and also conferences in New York under the auspices of the New York Regional Planning Association. He testified that he has spent a great many hours riding and walking about all areas in the borough, "alone and in company of other members of the planning board." Early in the history of the board a committee was designated to study and map existing land uses throughout the borough. A rough land-use map was prepared but was not kept as a permanent record.
The planning board eventually completed a draft of a revised zoning ordinance and submitted it to the mayor and council in August 1953. From that date until the adoption of the ordinance presently in question there were numerous meetings and conferences, formal and informal, between the planning board and the mayor and council respecting the subject matter thereof, and there were several public hearings on the proposed ordinance in various stages of its revision. As originally prepared by the board, the present R-3 zone district in which the Clary property is situated was set up as an R-2 zone district, calling for a minimum lot area of 32,000 square feet. After a public hearing, at which the Clary and Maida interests protested, the district was reduced to an R-3 residence zone (20,000 square feet). Over objection on the part of the plaintiff, Carling answered a question as to "what considerations the *60 planning board took in determining to classify the Clary property in the R-3 zone," as follows:
"A. We considered the fact that this land and that adjacent to it, particularly the Maida properties, represented a sizable area, I think in the order of 90 acres of undeveloped land. It is known to be good residential land, or prime for residential development purposes. I believe Mr. Clary's land is the highest land on the east side of the borough, and as such would command a certain amount of careful consideration to preserve its value as a residential section of the borough.
We took into account the fact that in the general area there are lands used for other purposes and residential purposes, and beyond that there are lands used and intended for use in business and industrial zones.

* * * * * * * *
* * * To protect the value, then, of this land and the adjacent lands to it, we established a pattern of gradation, considering, let us say, the highway, Route 35, running more or less north and south throughout the center of the borough and used for business and industrial purposes, an area adjacent to it occupied by the Norwood Homes tract as a residential usage, not of the quality that we would expect to find on the Maida and Clary properties, but to serve as a buffer zone between the influences of business and industry on Mr. Clary's land. Similarly, a continuation of that same R-4 zone in the area which has been referred to in this case as the Cleveland Farm serves as a buffer from the general southwesterly section where the drive-in theatre is located. That same general pattern of thinking then followed all the way around the territory, and as a matter of fact, served for the basis of thinking in the entire zoning program and planning program.
We did take into account as well the fact that modern homes require larger lot sizes because of their architecture, ranch type houses producing a greater building frontage than the older two-story or bungalow type of house. That called, then, for a greater frontage. To provide latitude in placing a house within the lot confines, the side yard and rear yard requirements have been established so that not all houses need be exactly the same or placed in the same precise position on the lot, thus again enhancing the value of the area as a community with a certain amount of distinctiveness about it, rather than the mass-produced effect of small lots and small houses precisely located in the only way that they can be located on a small lot. * * *"
The witness also testified that the planning board took into account the fact that since there was no public sewerage system in the municipality, larger lot areas would be desirable from a health standpoint, better to permit soil absorption of *61 sewage. He mentioned the objective of preventing the "whole eastern section of the municipality" from being characterized as small-lot, low-cost housing and indicated that the area in question was the only high quality residential land available in that part of the borough for half-acre lots. They also gave consideration to the desirability of reduction of population density and such concomitant benefits as limitation of traffic.
Herbert H. Smith, a professional planning and zoning consultant whose qualifications have been noted by our courts, was engaged by the borough as a consultant in the drafting of the ordinance. He worked on the project some two weeks in man-hours over a period of several months in the spring of 1954. While he did not prepare the zoning ordinance itself but only made technical suggestions, his work required him to become familiar with the municipality as a whole and the neighborhood of the subject property in particular. He was asked at the trial whether he had an opinion as to the reasonableness of the classification of the Clary tract under the zoning ordinance as enacted. He explained his affirmative answer as follows:
"Q. And what is that opinion? A. Taking into account the studies that the community has made in conjunction with this zoning, the various ideas that they have for future development, the characteristics of the surrounding area and the potentialities of the entire community, I believe that the present zoning of this area is reasonable."
He was asked on cross-examination whether he would recommend that a tract of ground "surrounded" as is the Clary tract should "be up-graded so that the lots in that tract of land would have to be 170% larger" than lots on which homes had been erected nearby. He answered:
"A. Speaking strictly from a hypothetical standpoint in the proposition that you have presented, I would say that there would certainly be occasions that such an upping would be justified; that the factors that I have mentioned as having been taken into consideration in reaching an opinion on the Eatontown zoning ordinance would be among those factors."
*62 The trial judge filed findings of fact and conclusions of law which, summarized, recite the "phenomenal population growth in recent years" in the Borough of Eatontown, "like many municipalities in Monmouth County," the character of the municipality as densely built up in the "old section" in the northerly part of the borough, with a diminishing density south, east and west; that the borough has no public sewer system and each dwelling requires individual septic tanks, that the Clary tract is "suitably and attractively located for the purpose of subdivision for residential development"; that the property could be profitably developed for sale to home owners on plots having a minimum area of 20,000 square feet, minimum lot frontage of 100 feet, improved by houses so that the parcel could be advantageously and profitably sold for from $15,000 to $17,000; and that the present trend in real estate development is toward larger plots to accommodate one-story or ranch-type houses. The court concluded its findings with a determination that the ordinance was "an exceptionally good one," adopted with the general view of benefiting the entire borough; that due consideration was given to various of the statutory objectives for zoning set forth in R.S. 40:55-32; that careful consideration was given "to the character of the district in which plaintiff's property is located as well as to the character of the neighboring districts and to the remainder of the borough," and also to the peculiar suitability of plaintiff's property for its present use as well as its most appropriate and advantageous use to plaintiff. The conclusion of law was that the plaintiff had failed to sustain the burden of showing that the zoning ordinance was unreasonable, either generally or in its application to the plaintiff's properties, both the 58-acre tract and the small parcels in the Chestnut Grove area. Judgment was consequently entered for the defendant.
Aside from all other considerations, we should, of course, give due weight to the opportunity of the trial judge to see and hear the witnesses and form a conclusion as to the reliability and weight of their testimony. This *63 is particularly important in the present case, in view of the close factual issue at the trial as to the economical feasibility of development of the Clary tract for residential purposes under the limitations of the ordinance, since residential development is clearly the only practicable use of the property from an economic viewpoint. There were two real estate experts who purported to support the thesis that the property was not susceptible of economic development on a 20,000 square-foot minimum lot basis. There was one real estate expert in controversion. Two planning experts were divided on the issue of reasonableness. In such a sharp clash of opposing experts the factor of personal appraisal by the hearer of the demeanor of the witnesses and of the reliability and probative weight of their testimony becomes particularly weighty.
Our first review problem is the sufficiency of the evidence to support the trial finding that the ordinance was not confiscatory as to plaintiff. We are unable, on the proofs adduced, to conclude that the finding is so far unsupported by the evidence as to call for reversal. The conclusion of the trial court and of the defendant's experts on this score accords with the presumption that a municipal zoning ordinance is valid and reasonable in its impact upon property owners. Pierro v. Baxendale, 20 N.J. 17, 26 (1955); Cobble Close Farm v. Board of Adjustment, Middletown Township, 10 N.J. 442, 451 (1952). There was substantial evidence on the side of the defendant and our close study of the record does not satisfy us that the evidence contra on the issue of confiscation was such as to compel a conclusion in favor of plaintiff. We agree with and concur in the trial finding on that issue.
There are other issues in the case as we view it which require more extended discussion. One of them may be stated as whether there is sound legal justification for the assumption underlying the premise implied by the allegation in the complaint herein that the ordinance in question has placed the Clary tract "within a zone in which the best use for which the property is adapted is prohibited" (paragraph *64 6). It might be difficult to refute the factual thesis that the Clary tract would be more readily marketable, and perhaps at a higher price, if it were in a zone permitting the construction of residences on plots of 11,000 square feet (as permitted in R-4 zones) or less. The plain implication of plaintiff's emphasis in argument has been that surrounding developments already constructed and completed, wholly or partially, so stamp the character of the Clary property as to fix a natural optimum market for residential development of the property on building tracts of the same size as those predominantly found in Elkwood, Monmouth Park, Chestnut Grove and the Norwood homes. There is some factual basis for disputing this contention in view of the physical superiority of the Clary tract for attractive residences and the scattering of relatively large homes both north and east of the tract. But conceding agreement with the thesis made by plaintiff, it has no legal materiality in the light of the scope of the zoning power vested by the Legislature, with constitutional authorization, in the municipal governing body. As was stated for a unanimous Supreme Court in Cobble Close Farm v. Board of Adjustment, Middletown Township, supra (10 N.J., at page 452):
"* * * Zoning regulations are not to be formulated or applied (as plaintiff argues is required by R.S. 40:55-32) with a design to encourage the most appropriate use of plaintiff's property but rather `with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality.' (Emphasis supplied.) Collins v. Board of Adjustment of Margate City, 3 N.J. 200 (1949); Duffcon Concrete Products, Inc. v. Borough of Cresskill, 1 N.J. 509 (1949); Guaclides v. Englewood Cliffs, 11 N.J. Super. 405 (App. Div. 1951)." (Emphasis by the court.)
Put in another way, "The standard is not the `advantage or detriment' to particular neighboring landowners," or, indeed, to the owner of the property in question, "but rather the effect on the entire community as a social, economic and political unit." Raskin v. Morristown, 21 N.J. 180, 196 *65 (1956). It is not sufficient for the plaintiff to show that it would be more profitable for him to use his property in a manner prohibited by the ordinance; he must show an abuse of discretion resulting in an unreasonable exercise of the zoning power. Fischer v. Township of Bedminster, 11 N.J. 194, 206 (1952); Cobble Close Farm v. Board of Adjustment, Middletown Township, supra (10 N.J., at page 452); Berdan v. Paterson, 1 N.J. 199, 205 (1948). The essential question is whether it is clearly demonstrated that the ordinance classification has no "real and substantial relation" to one or more of the zoning considerations specified by the statute, R.S. 40:55-32. Roselle v. Wright, 21 N.J. 400, 408 (1956). As was said by this court as to the similar restriction involved in the ordinance litigated in Rockaway Estates Inc. v. Rockaway Township, 38 N.J. Super. 468, 478 (App. Div. 1955),
"The core of plaintiff's opposition is really that the lot size requirement prevents the most profitable use of his land. But the welfare of the community for all time cannot be subordinated to the profit motive of an individual landowner."
Plaintiff indicates that his 58-acre tract might properly be zoned differently from the small plot developments which he cites if the prescribed minimum lot area were not so much greater than the average lot dimensions in those developments. He stresses the 167% "up-grading" represented by a 20,000 square-foot minimum as against the 7,500 square-foot lots on which nearby homes have actually been erected. But the same legal principles nevertheless continue to be applicable. Conceding, arguendo, that plaintiff would do better profitwise in developing his tract on lots intermediate in size between 7,500 square feet and 20,000 square feet (but note that the surrounding areas are all zoned 11,000 square-foot minimum), it remains true that the profit criterion is not the test of validity and that the arbiter of lot sizes, as of all other specifications of the ordinance, within reason, is the governing body of the municipality, not the property owner's sense of what is appropriate. Moreover, in this regard, plaintiff's planning expert, Mr. *66 Black, deflates the emphasis ascribed by plaintiff to the percentage comparison of zones by size of plot. He holds, as indicated above, that the relevant factor is comparison of improved parcel valuations rather than plot sizes. (Compare the ordinance involved in Fischer v. Township of Bedminster, supra, in which neighboring residential zones varied in prescribed minimum lot areas from one acre to five acres.) Taking a figure of $19,000 as the approximate median value for a prospective home on the Clary tract (as between the estimates of defendant's witness, McGinness, and plaintiff's real estate witnesses as to the type of home which would be expected to be erected on this tract, using 20,000 square foot plots), it is found that the gradation thereof above the valuation of the average home in the surrounding developments is considerably more moderate and that in the instances of a number of homes near the Clary tract the values are closely comparable.
The evidence indicates strong concern by Eatontown over prospective over-population. It is by now, of course, well settled that control of density of population is a proper zoning objective and a commonly approved technique for that purpose is minimum building lot areas. Fischer v. Township of Bedminster, supra (five acres and one acre); Rockaway Estates Inc. v. Township of Rockaway, supra (40,250 square feet, 20,000 square feet, 6,000 square feet); 58 Am. Jur., Zoning, § 52, p. 974; 1 Yokley, Zoning Law and Practice (2d ed. 1953), § 170, p. 421; Annotation 141 A.L.R. 693; Dilliard v. Village of North Hills, 276 App. Div. 969, 94 N.Y.S.2d 715, 716 (App. Div. 1950); Simon v. Town of Needham, 311 Mass. 560, 42 N.E.2d 516, 518, 141 A.L.R. 688 (Sup. Jud. Ct. 1942); Franmor Realty Corp. v. Village of Old Westbury, 280 App. Div. 945, 116 N.Y.S.2d 68 (App. Div. 1952), motion for leave to appeal dismissed 304 N.Y. 843, 109 N.E.2d 714 (Ct. App. 1952); Flora Realty & Investment Co. v. City of Ladue, 362 Mo. 1025, 246 S.W.2d 771, 774, 777 (Sup. Ct. 1952); Clemons v. City of Los Angeles, 36 Cal.2d 95, 222 P.2d 439, 443, 445 (Sup. Ct. 1950); DeMars v. Zoning Commission of *67 Town of Bolton, 142 Conn. 580, 115 A.2d 653, 654 (Sup. Ct. Err. 1955); Gignoux v. Village of Kings Point, 199 Misc. 485, 99 N.Y.S.2d 280, 284, 285 (Sup. Ct. 1950). It will be noted that in the case last cited the court makes the point that the less restricted nature of contiguous property across a municipal boundary line does not make a residential zoning restriction unreasonable (99 N.Y.S.2d, at page 285). The municipal authorities of Eatontown have evinced an appreciation not only of such mundane benefits from setting aside suitable areas for residences on larger plots, for example, as increased capacity of soil for sewage absorption and curtailment of traffic, but also the more intangible but no less respectable objective of community attractiveness. It is no longer to be doubted that this is an appropriate consideration within the statutory criterion of the "general welfare" R.S. 40:55-32. Pierro v. Baxendale, supra (20 N.J., at page 28); Lionshead Lake, Inc. v. Township of Wayne, 10 N.J. 165 (1952). In the Lionshead Lake case, supra, it was said (10 N.J., at page 174), "The size of the dwellings in any community inevitably affects the character of the community and does much to determine whether or not it is a desirable place in which to live." Mr. Justice Jacobs, concurring in the decision in that case, restated a previously expressed view (10 N.J., at page 177) "`that it is in the public interest that our communities, so far as feasible, should be made pleasant and inviting so that primary considerations of attractiveness and beauty might well be frankly acknowledged as appropriate, under certain circumstances, in the promotion of the general welfare of our people.'"
The testimony shows that the municipal fathers apprehended that the population rush into Monmouth and other shore counties in recent years might, under a local laissezfaire zoning policy, blanket Eatontown with small-lot, low-cost homes and, for the foreseeable future, prevent the community, particularly its northeast section, from having any better-type home areas. They were justified in attempting to prevent this by appropriate zoning of yet undeveloped *68 land. Cf. Monmouth Lumber Co. v. Ocean Township, 9 N.J. 64, 74 (1952); Collins v. Board of Adjustment of Margate City, 3 N.J. 200, 209 (1949); Rockaway Estates Inc. v. Rockaway Township, supra (38 N.J. Super., at page 473).
We do not believe that the argument purportedly based upon the rule requiring weight to be given to regional characteristics in planning and zoning, Borough of Cresskill v. Borough of Dumont, 15 N.J. 238 (1954); Duffcon Concrete Products v. Borough of Cresskill, 1 N.J. 509, 513 (1949); Hochberg v. Borough of Freehold, 40 N.J. Super. 276, 288 (App. Div. 1956); is soundly made in relation to the fact situation before us. While Eatontown debatably might have been justified, on strictly regional considerations, in limiting its residential development to small homes of the 7,500-11,000 square foot plot site type, had it chosen to do so, on the theory that regional requirements for larger homes could more appropriately be met by such neighboring residential communities as have already been mentioned, we cannot hold that it was under any legislative zoning mandate to follow that course. In our judgment, the local officials were entitled to plan and project higher grade residential districts within their own community, without regard to the presence of such developments in nearby municipalities, provided, always, this could be done without arbitrary or capricious treatment of land in the light of existing conditions. "A high class residence district is as essential to the local economy as multi-family and apartment house areas. Each has its place in a well-rounded municipal development; each has its part in a comprehensive plan for the utilization of local facilities for the common welfare." Cf. Collins v. Board of Adjustment of Margate City, supra (3 N.J., at page 209). Moreover, it seems to us that in a society of constantly progressing concepts as to healthful and wholesome living there should not be postulated any fixed limitations as to the capacity of given localities to absorb and adjust to better homes, or of higher-type housing to flourish in communities not previously experiencing it. "The police *69 function cannot be expressed in terms of a definitive formula that will automatically resolve every case." Katobimar Realty Co. v. Webster, 20 N.J. 114, 122 (1955). It has also been suggested on behalf of the municipality that residents in existing small homes in Eatontown might well aspire, as their economic conditions improve, to the ownership of larger homes within the same community, and we agree that this is a legitimate consideration for zone planning. Furtherance of the social as well as the economic and political advantages of a community are reasonable zoning objectives. Fischer v. Township of Bedminster, supra (11 N.J., at page 203).
The presently controlling concept of reasonableness in zoning stems from the federal cases construing the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, and the New Jersey decisions have accepted interpretative rulings of the United States Supreme Court, beginning with Village of Euclid v. Amber Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), as authoritative. See Fischer v. Township of Bedminster, supra (11 N.J., at page 203); Pierro v. Baxendale, supra (20 N.J., at page 21); Raskin v. Morristown, supra (21 N.J., at page 196). The canon of construction enunciated by the Euclid case is: "If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." (272 U.S., at page 388, 47 S.Ct., at page 118.) The rule has been applied in cases where our Supreme Court has concluded that a zoning classification was unreasonable, Katobimar Realty Co. v. Webster, supra, 20 N.J., at page 124), as well as in many where ordinances have withstood attack. In the recent Pierro case, supra, the court emphasized the tendency toward judicial abstention from interference with municipal zoning policy and judgment in upholding the ordinance there involved as not "wholly without reasonable basis" (20 N.J., at page 26). The court went on to say:
"* * * It must always be remembered that the duty of selecting particular uses which are congruous in residential zones was *70 vested by the Legislature in the municipal officials rather than in the courts. Once the selections were made and duly embodied in the comprehensive zoning ordinance of 1939 they became presumptively valid and they are not to be nullified except upon an affirmative showing that the action taken by the municipal officials was unreasonable, arbitrary or capricious. * * *" (Ibid.)
Courts should be at pains to give more than lip service to that rule and ought, in punctilious observance of the proper limitations of the judicial function, allow fullest flexibility to the range of well-informed local judgment as to the precise way in which local zoning can best serve the welfare of the particular community.
In summary, we conclude that the municipal officials of Eatontown, after long study, aided by the labors of an industrious and conscientious planning board, arrived at a conception of graduated residential zoning conceived to be for the best interests of the entire community, now and prospectively; that all of the objectives which the evidence indicates motivated the planning board and the governing body are material and pertinent under the statute; that in setting up the 130-acre R-3 residence zone district, inclusive of the Clary tract, the municipality did give consideration to the actual development on the ground of neighboring residential areas, as well as to the existing and potential character and development of the subject property and of the community as a whole; that its decision in the ordinance under attack to restrict building sites in that district to plots of 20,000 minimum square feet, while perhaps disputable as a matter of judgment, cannot be said to be so far removed from the category of fair debate as to warrant judicial nullification of such action as a classification without real or substantial relation to proper zoning standards and therefore clearly arbitrary and capricious. Insofar as the 58-acre Clary tract is concerned, therefore, we concur in the conclusion of the trial court that the ordinance is reasonable and valid.
By way of footnote, we turn to the attack made in the brief of plaintiff upon the admission, over objection, of the testimony of the president of the planning board concerning *71 the considerations taken into account by that body in formulating the revised ordinance submitted to the mayor and council. That testimony has been discussed hereinabove. The justification for its admission on an issue of reasonableness would seem to be evident where the municipal action is shown to have been as closely associated with the work and recommendations of its planning board as here. Plaintiff cites cases which stand for the proposition that the intent of the lawgiver is to be found in the language used. See, for example, Burnson v. Evans, 137 N.J.L. 511, 514 (Sup. Ct. 1948). The authority is not apposite. No issue is here drawn as to the meaning of the ordinance. The question is one as to its effect and reasonableness. Reasonableness is a two-sided coin. On one side is the adverse impact of the restriction upon him who asserts its unreasonableness. On the other are the social and policy considerations which led to the adoption of the regulation. The final assessment of reasonableness involves a balancing of the considerations on one side of the coin as against those on the other. The more cogent the social pressures impelling the adoption of the restriction the greater the permissible abrasion of the interests of the individual affected. The testimony in question went to the manifold considerations authorized by the zoning statute which inspired the particular restriction here attacked. While it has been held that an inquiry into legislative motivation will not be permitted in order to impugn the reasonableness of legislation valid on its face, 5 McQuillin, Municipal Corporations (3rd ed. 1949), § 16.90, p. 323; Sunny Slope Water Co. v. City of Pasadena, 1 Cal.2d 87, 33 P.2d 672, 677 (Sup. Ct. 1934), yet courts will consider evidence with respect to the purpose, object, reason, necessity and effect of an ordinance where the factors bearing upon its reasonableness are not manifest on its face. 5 McQuillin, op. cit., supra, § 18.24, p. 460. As was said in People v. Leighton, 44 N.Y.S.2d 779, 781 (Cty. Ct. 1943):
"While the court may determine the reasonableness or unreasonableness of a municipal ordinance by an inspection of it on its face, it sometimes becomes a question of fact whether under a given *72 situation or circumstances the regulation or its administration is reasonable [and] evidence aliunde is admissible to determine that question."
There are many examples in the New Jersey decisions of the consideration of comparable testimony in zoning cases with no question raised as to admissibility. Mansfield & Swett, Inc. v. West Orange, 120 N.J.L. 145, 159 (Sup. Ct. 1938); Brookdale Homes, Inc. v. Johnson, 123 N.J.L. 602, 605 (Sup. Ct. 1940), affirmed 126 N.J.L. 516 (E. & A. 1941); Scarborough Apartments, Inc. v. City of Englewood, 9 N.J. 182, 192, 193 (1952); Rockaway Estates, Inc. v. Rockaway Township, supra (38 N.J. Super., at pages 476, 477); Cf. State v. Mundet Cork Corp., 8 N.J. 359, 369 (1952); Prinz v. Paramus, 120 N.J.L. 72, 74 (Sup. Ct. 1938), affirmed 121 N.J.L. 585 (E. & A. 1939). The reliance by the court in the Rockaway Estates case, supra, on such testimony is evidenced by its comment (38 N.J. Super., at page 475) that "* * * the plan is comprehensive not only because the physical partition into zones appears to be reasonable but also because that partition in its broadest aspects portrays reasonable planning for the orderly development of the community in the future." Liberality in the reception of evidence for such purposes is found elsewhere, Ex Parte Bock, 125 Cal. App. 375; 13 P.2d 836 (D. Ct. App. 1932); Bellerive Inv. Co. v. Kansas City, 321 Mo. 969, 13 S.W.2d 628, 641 (Sup. Ct. 1929); Evison v. Chicago St. P.N.P. & O. Ry. Co., 45 Minn. 370, 48 N.W. 6, 7, 11 L.R.A. 434 (Sup. Ct. 1891).
We hold that the testimony of a member of a municipal planning board which submitted to and consulted with the members of the governing body concerning a proposed zoning ordinance, regarding the purposes and objects sought to be served and accomplished by the ordinance, is admissible, although, of course, in nowise controlling, when the issue is the reasonableness of the ordinance.
It remains to consider the attack made by plaintiff on the zoning classification of his ten building lots in the *73 Chestnut Grove development. The ordinance places that development in an R-4 residence district, calling for minimum lot areas of 11,000 square feet and minimum frontages of seventy-five feet, except that the minimum frontage of corner lots is required to be 100 feet on each street. Chestnut Grove contains some 30-odd acres and is divided into 25-foot lots. Inspection of the map of the development introduced in evidence by plaintiff shows that substantially the greater part of the land area is not yet built upon and that many of the homes constructed do substantially conform to the new zoning requirements. Plaintiff contends that none of his ten lots have sufficient frontage, that eight have insufficient land area and four insufficient side yard width to comply with the present zone requirements. It does not appear, however, that plaintiff has made any application to the local board of adjustment for a variance in respect to any of the lots in question. It was, moreover, established on cross-examination of the plaintiff that he conveyed out, pending the consideration and since the adoption of the zoning ordinance, a number of his lots for nominal considerations in such manner as to increase the number of non-conforming building sites of record. It was practically conceded by the plaintiff, and we think the inference is inescapable, that these conveyances were "dummy" transactions specifically designed to heighten the apparent unreasonableness of the restrictions in application to the plaintiff's lots in contemplation of this attack upon the ordinance.
Insofar as plaintiff's properties in this development may bona fide not comply with the zone restrictions, their incidence does not affect the validity of the regulation, if otherwise reasonable, as such situations may presumably be relieved by application for variance to the municipal board of adjustment. Fischer v. Township of Bedminster, supra (11 N.J., at pages 205, 206).
We concur in the conclusion of the trial court that the zoning of the Chestnut Grove area in the present ordinance is reasonable and valid, both generally and in its application to plaintiff's properties.
*74 Plaintiff has argued the additional point that the trial judge was without jurisdiction to hear and decide the cause because his lawful term of office had previously expired. This precise question has been disposed of adversely to plaintiff's contention in Switz v. Middletown Township, 40 N.J. Super. 217 (App. Div. 1956).
Judgment affirmed.