746 A.2d 73 (1998)
Dennis WITT and Lynn Witt, Individually and as members of Maywood Property Owners Association, Plaintiffs,
v.
BOROUGH OF MAYWOOD, Defendant.
Dennis Witt, Individually and Maywood Property Owners Association, an unincorporated association consisting of resident property owners of Maywood, Plaintiffs,
v.
Maywood Planning Board and, Independence Bank of New Jersey, Defendants.
Dennis Witt and Lynn Witt, Plaintiffs,
v.
Borough of Maywood, Defendant.
Superior Court of New Jersey, Law Division, Bergen County.
Decided June 30, 1998.
*75 James V. Segreto, Haledon, for plaintiffs (Segreto & Segreto, attorneys; Mr. Segreto, on the brief).
William F. Rupp, Hackensack, for defendant Borough of Maywood (Rupp & Ten Hoeve, attorneys; Mr. Rupp, on the brief).
James A. Farber, Teaneck, for defendant Commerce Bank, formerly known as Independence Bank of New Jersey (DeCotiis, Fitzpatrick & Gluck, attorneys; Mr. Farber, on the brief).
Thomas W. Randall, Hillsdale, for defendant Borough of Maywood Planning Board (Randall, Randall & Stevens, attorneys; Mr. Randall, on the brief).
*74 The opinion of the court was delivered by JONATHAN N. HARRIS, J.S.C.

BACKGROUND
These three consolidated proceedings in lieu of prerogative writs comprise separate, but related, chapters in the saga of the Borough of Maywood's (Maywood) attempt to redevelop and expand a critical portal to its central business district. Commerce Bank (Commerce)(formerly known as Independence Bank of New Jersey) sought permission to develop an underutilized tract of land located at the intersection of East Pleasant Avenue and Maywood Avenue by the construction and operation of a new bank branch facility. Commerce's property is located adjacent to a Maywood municipal parking lot which presently serves local residents. Commerce's proposal invited Maywood to engage in an exchange of easements to facilitate an efficient use of Commerce's land, and in return, Commerce would improve and expand the municipal parking lot so that it could be effectively used for local residents and shoppers.
In order to make this public-private partnership a reality, zoning changes were necessary because a portion of Commerce's property and all of Maywood's property were located in a residential zone where a bank branch was not a permitted use. Maywood Ordinance 6-96 (rezoning ordinance) was adopted by Maywood after a year of debate and before Commerce obtained approval for its application for development from the Maywood Planning Board (Planning Board). After the Planning Board conferred development approvals to Commerce permitting the proposed development, Maywood adopted Ordinance 3-97 (easement exchange ordinance) which put the finishing touch on the plan.
Plaintiffs were objectors at the Planning Board hearings; they commenced three proceedings at different times to challenge the trio of municipal actions that culminated in Commerce's receipt of development approvals: Maywood's rezoning ordinance; Maywood's easement exchange ordinance; *76 and the Planning Board's approval of Commerce's development application for the site. A consolidated trial was conducted which presented plaintiffs' primary theme that the actions of Maywood and its Planning Board were an impermissibly ad hoc orchestration intended to advance the interests of a private property owner at the expense of the public interest. I conclude that the actions of Maywood are unobjectionable, but that the conduct of the proceedings before the Planning Board was violative of law and requires a remand for an entirely new hearing.

FINDINGS
The property in question lies along the east side of heavily trafficked Maywood Avenue and extends from Passaic Street to East Pleasant Avenue. It is designated on Maywood's Tax Assessment Map as Block 78 Lots 1, 2, 3, 4, 5 and 25. Commerce controls Lots 3, 4, and 5. Maywood owns Lots 1, 2, and 25. Before public activity began in this case, all of the lots except Lot 4 were zoned for residential use. Lots 3 and 4, however, were utilized for nonconforming commercial uses. Lots 1, 2, and 25 were used for municipal purposes including a municipal parking lot and park. Lot 5 was used strictly for residential purposes.
The land is located at the eastern boundary of the central business district in Maywood, which district extends for many blocks west along West Pleasant Avenue (the western extension of East Pleasant Avenue). The improved portions of Lots 3 and 4 consist of a residential-type structure which has been devoted to commercial use and is used for an insurance agency. Also on Lot 4 is a nonconforming automobile repair facility. The municipal parking lot is virtually indistinguishable from an unimproved vacant lot except for the ingress/egress curb cuts, signage, and wheel ruts which mark its use as a parking yard. It has space for twenty-five motor vehicles, of which twenty parking spaces are utilized by Maywood residents who live in the area. The vest-pocket municipal park is on a tidy corner property improved with a lovely gazebo with minimal landscaping. Lot 5, fronting on East Pleasant Avenue, is actively devoted to residential use.
In 1995, Commerce contracted to buy Lots 3, 4, and 5, subject to obtaining the necessary approvals to develop the property for a branch bank. These lots, by themselves, would not support the intended development because of incompatible zoning and inadequate size which severely limited the most-efficient use of the land for its intended purpose.
On June 2, 1995 Commerce made the first public overture to Maywood. It requested that the governing body consider rezoning Commerce's contracted-for property and Maywood's adjoining land and suggested entering into an exchange of easements for ingress, egress, and parking so that Maywood and Commerce would benefit from upgraded parking and banking facilities at this crucial portal to Maywood's central business district.
Maywood ultimately referred Commerce's informal proposal for rezoning to the Planning Board for its review and consideration. The Planning Board considered the proposal and from time to time communicated its various concerns and recommendations to Maywood. Coincidentally, in and around the same time, the Planning Board was engaged in a periodic review of Maywood's Master Plan. The Planning Board approved a Master Plan update shortly before the close of 1995. However, it did not include in the 1995 Master Plan update any recommendation concerning the Commerce proposal.
It was not until May 1996, that the Commerce rezoning proposal received any significant municipal attention. It was at that time when Maywood introduced Ordinance 6-96 which provided for the rezoning from residential use to commercial use to enable Commerce to proceed with its development application. The Planning Board was assigned the responsibility by Maywood to review Ordinance 6-96 and to *77 report to Maywood with its recommendations as to adoption. The Planning Board completed its review without taking exception to anything in the rezoning ordinance. On June 25, 1996, Maywood adopted the rezoning ordinance. Now the land uses permitted on the property would support Commerce's intended use.
Commerce initiated its application for development before the Planning Board. It was a hotly contested proceeding, with tempers short and skins thin. The Planning Board granted conditional approval (including necessary variances) to Commerce's plan on January 7, 1997. Some of the conditions attached to the Planning Board's approval were: requiring Commerce to make off-site drainage improvements; requiring Commerce to obtain appropriate easements from Maywood for the shared access and use of the lots; and requiring Commerce to ensure that all intersection improvements be made at Commerce's cost.
On January 28, 1997, Maywood introduced the easement exchange ordinance. It was ultimately adopted in February 1997. The easement exchange ordinance required, among other things: that Commerce and Maywood exchange instruments permitting ingress, egress and access across their respective contiguous properties; that Commerce be responsible for all site improvements, including drainage, paving, signage and engineering costs; that Maywood receive the exclusive use of sixteen parking spaces; and that Commerce pay $30,000 for signalization improvements along Maywood Avenue.
At the trial, Plaintiffs asserted that the core municipal actions were improper because of a series of substantive and procedural gaffes. They claim, for instance, that Maywood and the Planning Board engaged in multiple serious violations of the Open Public Meetings Act (OPMA), N.J.S.A. 10:4-6 to -21; that the rezoning ordinance was tailor-made for Commerce without consideration of the public interest and that it is inconsistent with Maywood's Master Plan; that the easement ordinance was a donation of municipal property because of inequality in valuable consideration which violates the Local Lands and Buildings Law (LLBL), N.J.S.A. 40A:12-1 to -30; and that the Planning Board deprived plaintiffs of due process of law and violated the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -136. In order to address these, and the other issues raised by the parties at trial, I will first embark upon an analysis of the applicable legal principles that govern my decision-making.

CONCLUSIONS OF LAW
The governing body of Maywood, defined as "the chief legislative body of the municipality," N.J.S.A. 40:55D-4, is vested with broad power by the state Constitution and statutes. Article IV, Section 7, paragraph 11 of the New Jersey Constitution provides:
The provisions of this Constitution and of any law concerning municipal corporations formed for local government... shall be liberally construed in their favor. The powers of ... such municipal corporations shall include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law.
Courts have consistently read this constitutional provision as a mandate to liberally construe powers granted to municipalities, either by express terms or by implication, in their favor. Township of Berkeley Heights v. Board of Adjustment, 144 N.J.Super. 291, 296, 365 A.2d 237 (Law Div.1976) (finding that that constitutional provision compels the courts "`to interpret statutes liberally in favor of the existence of local power to deal with local needs.'") (quoting Whelan v. New Jersey Power & Light Co., 45 N.J. 237, 251, 212 A.2d 136 (1965)); see also Fanelli v. City of Trenton, 135 N.J. 582, 591, 641 A.2d 541 (1994) *78 (holding that Legislature's delegation of authority to municipalities is to be interpreted broadly).
Under the general powers granted by Article III of the New Jersey Constitution, the legislative branch of government has been granted the authority to regulate land use. See William M. Cox, New Jersey Zoning and Land Use Administration § 1-1 (1997). Article IV, Section 6, paragraph 2 of the New Jersey Constitution authorizes the Legislature to delegate some of that regulatory power to municipalities. Pursuant to that authority, the Legislature enacted the MLUL. The MLUL grants municipalities exclusive powers to adopt and enforce zoning ordinances, N.J.S.A. 40:55D-62. Township of Dover v. Board of Adjustment, 158 N.J.Super. 401, 411, 386 A.2d 421 (App. Div.1978) (recognizing that municipality, through its governing body, is empowered "to establish ... the essential land use character of the municipality").
Under the MLUL, municipalities are charged with the general goal of "guid[ing] the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals, and general welfare." N.J.S.A. 40:55D-2(a). To accomplish that goal, the MLUL delegates power to three municipal agenciesthe governing body, the planning board, and the zoning board of adjustmentthat work to develop, enforce, and grant relief from the municipality's zoning scheme.
Municipal action will be overturned by a court if it is arbitrary, capricious or unreasonable. Charlie Brown of Chatham v. Board of Adjustment of Chatham, 202 N.J.Super. 312, 321, 495 A.2d 119 (App.Div.1985); Drake v. Human Servs. Dept., 186 N.J.Super. 532, 536, 453 A.2d 254 (App.Div.1982); In re Application of Holy Name Hosp., 301 N.J.Super. 282, 295, 693 A.2d 1259 (App.Div.1997). However, municipal actions enjoy a presumption of validity. Fanelli v. City of Trenton, 135 N.J. 582, 589, 641 A.2d 541 (1994); Ballantyne House Assocs. v. City of Newark, 269 N.J.Super. 322, 337, 635 A.2d 551 (App.Div.1993). Thus, a challenge to the validity of a municipal ordinance or action must overcome the presumption of validitya heavy burden. 515 Assocs. v. City of Newark, 132 N.J. 180, 185, 623 A.2d 1366 (1993); First Peoples Bank v. Medford Township., 126 N.J. 413, 418, 599 A.2d 1248 (1991).
When two actions are open to a municipal body, municipal action is not arbitrary and capricious if exercised honestly and upon due consideration, even if an erroneous conclusion is reached. Worthington v. Fauver, 88 N.J. 183, 204-05, 440 A.2d 1128 (1982); Bayshore Sewerage Co. v. Department of Envtl. Protection, 122 N.J.Super. 184, 199, 299 A.2d 751, (Ch.Div.1973), aff'd, 131 N.J.Super. 37, 328 A.2d 246 (App.Div.1974). A determination predicated on unsupported findings is the essence of arbitrary and capricious action. In re Boardwalk Regency Corp. for Casino License, 180 N.J.Super. 324, 334, 434 A.2d 1111 (App.Div.1981), modified on other grounds, 90 N.J. 361, 447 A.2d 1335 (1982).
Legislative bodies are presumed to act on the basis of adequate factual support and, absent a sufficient showing to the contrary, it will be assumed that their enactments rest upon some rational basis within their knowledge and experience. This presumption can be overcome only by proofs that preclude the possibility that there could have been any set of facts known to the legislative body that would rationally support a conclusion that the enactment is in the public interest. Hutton Park Gardens v. West Orange Town Council, 68 N.J. 543, 564-65, 350 A.2d 1 (1975).
The New Jersey Constitution provides that, "no county, city, borough, town, township or village shall hereinafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation...." N.J. Const. art. VIII, § 3, ¶ 2. It further provides that, "no *79 donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatsoever." N.J. Const. art. VIII, § 3, ¶ 3.
The underlying principle is that "public money should be raised and used only for public purposes." Roe v. Kervick, 42 N.J. 191, 207, 199 A.2d 834, (1964); New Jersey Sports & Exposition Auth. v. McCrane, 119 N.J.Super. 457, 472, 292 A.2d 580 (Law Div.1971), modified on other grounds, 61 N.J. 1, 29, 292 A.2d 545 (1972). The "concept of public purpose is a broad one," and connotes "an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government." Roe v. Kervick, supra, 42 N.J. at 207, 199 A.2d 834. I am instructed by Roe that our concept of public purpose must "expand when necessary to encompass changing public needs of a modern dynamic society." Ibid. However, the determination of what constitutes a public purpose is primarily a function of the Legislature. New Jersey Sports & Exposition Auth. v. McCrane, supra, 119 N.J.Super. at 473, 292 A.2d 580. The Roe Court fashioned a two-part test to determine if the expenditure of public funds constitutes a prohibited donation. First, whether the provision of financial aid is for a public purpose, and second, whether the means to accomplish it are consonant with that purpose. Roe v. Kervick, supra, 42 N.J. at 212, 199 A.2d 834; Patzau v. Department of Transp., 271 N.J.Super. 294, 309-10, 638 A.2d 866 (App.Div.), certif. denied, 138 N.J. 268, 649 A.2d 1288 (1994). Thus, the activity must be one that serves a benefit to the community as a whole and at the same time is directly related to the functions of government. Davidson Bros., Inc. v. D. Katz and Sons, Inc., 121 N.J. 196, 217, 579 A.2d 288 (1990); Roe v. Kervick, supra, 42 N.J. at 207, 199 A.2d 834.

OPEN PUBLIC MEETINGS ACT
In conducting its dissection of Maywood's actions, plaintiffs have pointed out a number of purported violations of OPMA. The linchpin of plaintiff's OPMA challenge is the July 3, 1995 meeting between representatives of Commerce and the Planning Board to discuss the initial proposal to rezone Commerce's land. No minutes, notes, or verbatim transcript exist to memorialize this meeting. On the other hand, there is little evidence that this was a secret conspiratorial meeting or one in which far-reaching substantive discussions were held or plans were hatched. Even if it was contrary to the spirit and express mandate of OPMA, this meeting is of such little consequence in the grand scheme of things that either as an isolated event or as part of an aggregate course of action it is of minimal consequence to the overall result that took another eighteen months to unfold. If it is suggested that the Planning Board's conduct at that meeting was emblematic of how the municipality conducted itself thereafter, such a suggestion is belied by the evidence. Although it is possible to honestly criticize each component action of Maywood in this case, the overall impression is one of careful and laborious attention to the public interest, even if each step taken was not picture-perfect. In other words, the OPMA violations are de minimus in nature, did not infect the rezoning or easement exchange process, and was effectively erased by the multiple public contacts, participation, input, and oversight provided throughout the development of Maywood's planning. Given everything that transpired following the July, 1995 meeting, there has effectively been a de facto correction to validate the ultimate actions.

REZONING ORDINANCE
Plaintiff's main attack upon the rezoning ordinance is based upon the claim that it violates the MLUL insofar as it does not further the integrated and comprehensive goals of Maywood's zoning plan, and is a *80 mere accommodation for Commerce's parochial interests. In other words, plaintiffs claim it is spot zoning or contract zoning. Plaintiff's planning expert, Frank D. Mileto, was of the opinion that the rezoning was not in furtherance of Maywood's Master Plan because it increased the size of the commercial district (especially by rezoning Lot 5 from active residential use to commercial use) and limited Maywood's options for using its land for community purposes (including the construction of a new municipal building). Maywood and Commerce proffered the planning opinion of Michael F. Kauker, who not unsurprisingly advocated the proposition that the rezoning was consistent with sound zoning and planning.
A review of Maywood's Master Plan leaves much to be desired regarding specific reference to this critical area of land in Maywood. The Master Plandesigned to guide developmentis markedly ambiguous and unclear in its designation of which areas in Maywood are intended for central business district treatment, as depicted in its land use plan element. There were conflicting opinions, for example, whether Lots 5 and Lot 6 (not a part of this application but located directly east of the parcels in question) were shown on the land use plan element as commercial or residential. Frankly, there is no room in a Master Plan analysis for an ambiguity to exist as to what the document says regarding future land use. It must be objectively clear concerning its recommendations and should list the exact lots and parcels which are the subject of its studies. The trial was thus reduced at times to the extraordinary misadventure of trying to read a map in the Master Plan and figure out its scale and what property was designated as residential or commercial. This is a disservice when public funds are required to be spent to engage experts to decipher a map that is supposed to clearly inform the public of the municipality's land use recommendations.
Notwithstanding this unnecessary detour in the morass of mapping ambiguities, the most that can be said about plaintiffs' proofs concerning inconsistency with the Master Plan are that they are subject to reasonable debate. It is not objectively obvious that the rezoning ordinance either does violence to an integrated and comprehensive zoning scheme, or is objectively inconsistent with the ideals and goals of Maywood's Master Plan.
Manalapan Realty, L.P. v. Township Committee of Manalapan, 140 N.J. 366, 384, 658 A.2d 1230 (1995) holds that when comparing a zoning enactment to a Master Plan the concept of "substantially consistent" permits some inconsistency, provided it does not substantially or materially undermine or distort the basic provisions and objectives of the Master Plan. In Maywood's situation, an analysis of the Master Plan does not convince me that rezoning to allow commercial development at the most heavily traveled portal to the central business in Maywood is contrary to its intent and purpose. Rather, if one of the many goals of the Master Plan is to foster and burnish Maywood's central business district's potential, the rezoning may be understood to continue the salutary goal of revitalization of a local commercial district. Even if this contrasts with other goalsincluding preventing erosion of residential districtsit is not per se abhorrent to sound municipal planning. Certainly, it is not for the Judiciary to second-guess local legislators in this arena.
Plaintiffs characterize the formal actions of Maywood as pretextual cover-ups of Maywood's true intent to advance the interests of a private developer. In Riggs v. Long Beach Township, 109 N.J. 601, 538 A.2d 808 (1988) the issue before the Court was whether an ordinance which effectively reduced the number of lots in a tract of property in Brant Beach and which in practical effect applied only to Riggs had been passed for a valid purpose. The Court went on to find that it was not, concluding that the Ordinance in question *81 was passed "to reduce the value of the Riggs' property so that the municipality could acquire it below fair market value." Id. at 604, 538 A.2d 808. While the record in that case was replete with the official actions of the town, the result hinged on certain trial testimony of the mayor which clearly demonstrated that there was no bona fide zoning purpose for the ordinance other than to reduce the price of Riggs' tract for acquisition by the Township. Id. at 608-609, 538 A.2d 808. Nevertheless, in ruling as it did, the Court set forth a very significant principle:
In determining whether the ordinance was adopted for an unlawful purpose, we distinguish between the purpose of the ordinance and the motives of those who enacted it. Courts generally will not inquire into legislative motive to impugn a facially valid ordinance, but will consider evidence about the legislative purpose "when the reasonableness of the enactment is not apparent on its face." Clary v. Borough of Eatontown, 41 N.J.Super. 47, 71, 124 A.2d 54 (App.Div. 1956). Although the distinction between motive and purpose can be fuzzy, "motive" ordinarily addresses the subjective considerations that move a legislature, and "purpose" speaks to the goals to be achieved. See also Black's Law Dictionary 914 (defining "motive" as "[c]ause or reason that moves the will and induces action") and 1112 (defining "purpose" as "[t]hat which one sets before him to accomplish; an end") (5th ed.1979). The determination of "purpose" depends on objective factors, such as the terms of the ordinance and its operation and effect, as well as the context in which the ordinance was adopted. Developments in the Law, 82 Harv.L.Rev. 1065, 1091 (1969).
If an ordinance has both a valid and an invalid purpose, courts should not guess which purpose the governing body had in mind. If, however, the ordinance has but one purpose and that purpose is unlawful, courts may declare the ordinance invalid. Hence, when a party challenging an ordinance asserts that it was adopted for the improper purpose of depressing the value of the property in a condemnation proceeding, the court may seek to ascertain the municipality's true purpose in enacting the ordinance. This inquiry should be limited to an evaluation of the objective facts surrounding the adoption of the ordinance. Id. at 613, 538 A.2d 808.
I find that it is inappropriate to overrule the actions of Maywood based upon the supposed motives of the officials who voted in favor of the questioned actions. In this case, there is a clearly expressed and proper zoning purpose both in minimally expanding the commercial district to foster redevelopment and the appropriate use of land, and to facilitate better traffic flow on a heavily trafficked transportation artery. Where at least one such purpose is substantially supported by the record, it is irrelevant that an improper motive can be reasonably argued by plaintiffs.
It is hardly surprising in this age to recognize that virtually all zoning decisions confer direct and indirect benefits on some property owners. The opposite is also true: all zoning decisions deprive some property owners of valuable rights. In this case, plaintiffs assert that the private benefits to Commerce were the onlyor if not only, the primarymotivating factors which impelled Maywood to adopt the rezoning ordinance. Objectively, this is not correct. Even recognizing that the creativity and imagination of governing bodies and their attorneys may have the capacity to dress up and disguise otherwise illegal rezoning activity into acceptable land use regulation, there are substantial public benefits which flow from Maywood's zoning decision. It is no zoning sin to provide regulations that will encourage the appropriate of land in a commercial district and to attract a particular user to that end. Here, where the municipality did not initiate the zoning encounter, it is not disqualified from using *82 the suggestions of Commerce in a way that will spruce up Maywood's aging central business district and obtain a spanking new municipal parking lot at the same time. The suggestion by plaintiffs that Petlin Associates v. Tp. Of Dover, 64 N.J. 327, 316 A.2d 1 (1974) bars Maywood's active participation in a public-private partnership is based upon a too-crabbed a reading of the case, and ignores modern recognition of the role developers play in suggesting zoning changes. It is hardly considered extraordinary when local residents make zoning suggestions or even zoning demands, and governing bodies adopt ordinances to actualize the political pressure. In like vein, it is almost routine for developers to approach municipalities with development opportunities which ultimately ripen into entirely appropriate zoning changes. That plaintiffs disagree with the value judgments made by Maywood concerning the appropriate use of land does not detract from Maywood's ability to undertake progressive change, and does not give authority to this court to undo local legislative action that may be open to fair public debate. Maywood Ordinance 6-96 shall not be declared invalid.

EXCHANGE OF EASEMENTS ORDINANCE
Plaintiffs attack the easement exchange ordinance with equal vigor on the ground that it serves only to advance a private interest and that it is violative of the LLBL. N.J.S.A. 40A:12-16 provides as follows:
The governing body of any county, by resolution, or any municipality, by ordinances may exchange any lands or any rights or interests therein owned by the county or municipality, except lands used for public highways or places, for other lands or rights or interests therein desired for public use. The county or municipality may exact and receive a cash consideration in addition to such other lands or rights or interests therein when such exchange shall be authorized, and such governing body determines that the lands or rights or interests therein to be conveyed to such county or municipality or such lands or rights or interests therein and the cash consideration to be paid are at least of equal value to, and their acquisition is more advantageous to, the county or municipality for public use, than the lands or rights or interests therein to be conveyed by the county or municipality, and that it is in the public interest that such exchange of lands or rights or interests therein be consummated. Any prior dedication or determination for use for park purposes of such land or any part thereof, shall not preclude an exchange thereof or rights or interests therein under this section but where the lands or rights or interests therein to be exchanged by a municipality are lands or rights or interests therein that have been dedicated and determined for use for park purposes, or are rights or interests in lands so dedicated or determined, the lands or rights or interests therein received in exchange therefor by the municipality shall be used for the same purposes. For purposes of this section, any land or rights or interests therein to be exchanged by the county or municipality shall be valued at not less than the amount for which it was acquired or in the case of an acquisition by gift or devise, in an amount of not less than the "full and fair value" of the land or rights or interests therein as determined by the assessor of the municipality in which it is located pursuant to R.S. 54:4-23 for the tax year in which the land was acquired by the county or the municipality. Any land or rights or interests therein which shall be conveyed to the county or municipality in exchange for any county or municipal land or rights or interests therein shall be valued at no more than the "full and fair value" determined for the land or rights or interests therein by the assessor of the municipality in which the land or rights or interests therein is located pursuant to R.S. 54:4-23 for the *83 then current tax year. In any case in which the value of the county or municipal land or rights or interests therein to be exchanged exceeds the value of the land or rights or interests therein to be received by the county or municipality, the county or municipality shall exact additional cash consideration, as authorized herein, equal to the difference of the two values as determined pursuant to this section.
The fundamental principle contained within this statutory provision is that there must be a substantial equivalency between what the municipality is giving up and what it is receiving. In the context of property rights other than fee interests, the statute is less than enlightening because it contemplates the valuation of the exchanged interests based upon principles of equalized assessed valuation. Easements, however, are not subject to direct assessment for local property tax purposes and so resort to equalized assessment methodology to set equivalency parameters is inapposite.
Ordinance 3-97 provides that Maywood will receive an access and parking easement across the lands of Commerce (Lots 3 and 4) in exchange for giving up an easement for access across its land (Lots 1, 2 and 25). As part of the consideration, Maywood will obtain sixteen dedicated and improved parking spaces, the non-exclusive use of other parking spaces during non-banking hours, intersection improvements, drainage improvements, and road-widening easements.
No one disputes that in order for Commerce's project to be realized, it had to obtain easements from Maywood. The participation of Maywood was absolutely critical to the project. These actions, since they are directly linked to public benefits, may not fairly be criticized as being gifts, donations, or giveaways. Very often municipal actionsometimes direct and sometimes indirectresults in the ability of owners to better use their property. There is nothing inherently wrong or contrary to public policy by this result. In this case, the valuation of the tangible and intangible benefits accruing to Commerce by Maywood's actions is not part of the balancing test under the LLBL or the New Jersey Constitution. The property rights to be evaluated for equity are only those conventional elements embraced within the parties' bundle of rights to be exchanged in accordance with Ordinance 3-97.
At the trial, four experts were called upon to express their opinions concerning the value of the interests given up by Maywood and the value of the interests given up by Commerce. Plaintiffs' appraisal expert, Mr. Derek Eisenberg, determined that the value of the easement which is to be conveyed to Commerce is $200,000. This value was calculated by the simple expedient of valuing the total fee at $16 per square foot (using comparable sales), deducting the area of the easement, and recalculating the difference at $16 per square foot. This essentially treated the fee subject to Commerce's easement as valueless. Plaintiffs' expert did not separately value the easement obtained by Maywood, but he did calculate other losses claimed to be suffered by Maywood, including lost tax revenues which he capitalized at approximately $65,000. This loss was offset by the $14,000 benefit Maywood would obtain as represented by the cost of the parking lot improvements to be installed at Commerce's expense. The net loss to Maywood, according to plaintiffs, as a result of implementation of Ordinance 3-97, would be about $250,000.
Maywood proffered two expertsits Tax Assessor Mr. Wilbur Heinemeyer and appraiser Mr. Robert McNerneywho presented different views of who would receive the real benefit of the bargain under Ordinance 3-97. Mr. Heinemeyer used an equalized assessment valuation approach in an effort to be faithful to the strict language of the LLBL. I conclude that this approach is wholly unworkable in the realm of the exchange of easements *84 and is rejected. Mr. McNerney, on the other hand, used conventional appraisal techniques in determining his opinion that the value of the easements were $2.50 per square foot. Mr. McNerney extrapolated value from comparable sales data of transactions involving conveyances of easements. He determined that Maywood was granting an easement worth about $25,000 and was receiving an easement valued at about $20,000. This comparison did not take into account the other consideration provided to Maywood by Commerce.
Commerce's appraisal expert, Mr. Donald Helmstetter, determined that the value of each easement was $3.00 per square foot based upon his opinion that the existence of an easement reduced the value of the fee interest by $15%. Since Mr. Helmstetter's overall opinion of value of the fee was based upon $20 per square foot, the easements were arithmetically valued at $3.00 per square foot.
I conclude that the analysis conducted by Mr. McNerney is the most conventionally recognized methodology and is soundly based in appraisal theory. Mr. McNerney's opinion is closely supported by Mr. Helmstetter's opinion, but Mr. Eisenberg's notion that the easement on Maywood's property has a value equal to the fee ($16 per square foot) is belied by common sense. In order to adopt Mr. Eisenberg's opinion I would have to suspend reality and accept his idea that the property interest retained by Maywood after the grant of the easement to Commerce is valueless. This is not logical because Maywood retains substantial use and benefit of the public parking area subject to the easement. The remainder is clearly worth something quite valuable, and I conclude that the approach of Mr. McNerney which recognizes this reality is correct.
Plaintiffs argue that none of the additional consideration outlined in Ordinance 3-97 is allocable to determine if the easement exchange resulted in a balanced transaction. Plaintiffs submit that some of this additional consideration was already required to be provided by the conditions attached to the Planning Board approval, and therefore it may not be double-counted. However, it is questionable whether the off-site drainage improvements were validly extracted by the Planning Board, and the cost-equivalent benefit of Commerce constructing and maintaining the municipal parking lot adds value to Maywood's side of the ledger. I conclude that some of plaintiffs' argument is correct, but in the aggregate analysis, the adoption of Ordinance 3-97 was neither arbitrary, capricious, or unreasonable, nor did it constitute a palpable abuse of discretion. Maywood will obtain myriad benefits from the entire development process. It can not be held to the bean-counting analysis of plaintiffs if it is to effectively and efficiently conduct its governmental function. Overall, in the grand mix of benefits and burdens there is substantial equivalency in what Maywood will give up and what it receive. Maywood Ordinance 3-97 shall not be declared invalid.

PLANNING BOARD ACTION
Plaintiffs complain that the proceedings before the Planning Board in reviewing Commerce's development application were arbitrary, capricious and unreasonable. Judicial review of the decision of a Planning Board or Board of Adjustment ordinarily is limited. A board's decision "is presumptively valid, and is reversible only if arbitrary, capricious, and unreasonable." Sica v. Board of Adjustment, 127 N.J. 152, 166-167, 603 A.2d 30 (1992); Burbridge v. Governing Body of the Township of Mine Hill, 117 N.J. 376, 385, 568 A.2d 527 (1990). Courts will defer to a decision if it is supported by the record and is not so arbitrary, capricious, or unreasonable as to amount to an abuse of discretion. Kingwood Tp. Volunteer Fire Co. v. Board of Adjustment, 272 N.J.Super. 498, 502-03, 640 A.2d 356 (Law Div. 1993). Given its "peculiar knowledge of local conditions," a board must be accorded *85 wide latitude in the exercise of its delegated discretion. Kramer v. Board of Adjustment, Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965).
The starting point in the review of all local land use decisions is to explicate the memorializing Resolution adopted by the agency. N.J.S.A. 40:55D-10. This involves a nearly simultaneous reading of the entire verbatim transcript and analysis of the documentary evidence presented as exhibits before the board. Finally, it involves a searching review of the points of error highlighted by the parties in their arguments in briefs and at trial.
Plaintiffs claim that the Planning Board did not have sufficient competent evidence before it to grant the site plan, subdivision, and variance relief embodied in the approval. Moreover, plaintiffs claim that they were deprived of the fair opportunity to participate in and present evidence at the hearings conducted by the Planning Board. Notwithstanding the presumption of validity that ordinarily inoculates Planning Board action from attack, the overwhelming evidence in this case suggests a Planning Board more concerned about clearing its docket and less interested in hearing the panoply of issues from plaintiffs' representatives. The Planning Board was obligated to afford plaintiffs and all objectors a fair opportunity to address the full range of planning issues contained within Commerce's application. N.J.S.A. 40:55D-10(d). The Planning Board failed to provide that fair opportunity. It should have adjourned the hearing on November 4, 1996, especially where the objectors were surprised by the order of proceedings sprung upon them at the last minute. The notion that the Planning Board might have actually entertained listening to the objectors' witnesses (even if they were present and ready to testify) after midnight, is preposterous. The Planning Board should have continued the hearing to another date to allow all available evidence to be considered. The impatience displayed by Planning Board representatives, while perhaps explainable and maybe even understandable, resulted in depriving plaintiffs of even a chance to convince the Planning Board that approval of the site plan and variances was wrong. The Planning Board should never become the adversary of an applicant or an objector without risking dire consequences. Sometimes applicants are belligerent; sometimes objectors are obstructionist. The Planning Board must remain above the fray and conduct itself with dignity and even-handedness, even in the midst of a calamitous hearing. Sharp comments in the record aside, the action of the Planning Board in refusing to give plaintiffs a fair opportunity present all of their witnesses deprives the ultimate conclusion of legitimacy. It is a nullity.
The Resolution adopted by the Planning Board is the hallmark of the Planning Board's impatient attitude. It grants approval with the most conclusionary findings, without explaining the reasons or rationale for finding that Commerce had satisfied the positive and negative criteria of N.J.S.A. 40:55D-70(c)(1) or (2) in granting a critical variance adjacent to a residential district, and without making adequate findings and conclusions that would allow a trial court to even begin the explication process. The Planning board did not even describe what type of variance it was granting (hardship: "(c)(1)" or planning: "(c)(2)"). If the court does not understand why the Planning Board did what it purports to have done, effective review is impossible. The actions of the Planning Board shall be reversed and the development application is remanded for an entirely new hearing where the due process rights of all parties shall be scrupulously honored and preserved. This court shall not retain jurisdiction.

FINAL COMMENTS
The lasting impression imprinted by this case is one of a haltingly reasonable effort by Maywood to upgrade and improve its central business district. Although arguably *86 there are a variety of planning alternatives to the one chosen here, I can not say that the legislative action was contrary to law or violative of the public trust placed in Maywood's elected officials. Thus, Ordinance 6-96 and 3-97 are declared valid.
On the other hand, I am left with a most discomforting sense of ill treatment as a result of the conduct of the Planning Board. The only remedy which will protect and preserve the public interest is to provide for an entirely new hearing. I recognize that Commerce is largely blameless in the actions which compel a remand; nevertheless, there are times in the practice of land use law when events over which they have no control befall developers. Care of Tenafly v. Zoning Bd. of Adj. of Tenafly, 307 N.J.Super. 362, 374-378, 704 A.2d 1032 (App.Div.1998). This case is one more example.