47 A.3d 785

DOCK ST. SEAFOOD, INC., AND MIKALU, LLC,[1] PLAINTIFFS,
v. CITY OF WILDWOOD AND K. HOVNANIAN SHORE
ACQUISITIONS, LLC,[2] DEFENDANTS.

Superior Court of New Jersey
Law Division
Atlantic County

Decided March 30, 2011—Approved for Publication May 18, 2012.

---

[1] Plaintiff Mikalu, LLC settled prior to trial.

[2] Defendant K. Hovnanian Shore Acquisitions, LLC was dismissed prior to trial.

*Frank L. Corrado* for plaintiff Dock St. Seafood, Inc. (*Barry, Corrado, Grassi & Gibson,* attorneys).

*Andrew M. Brewer* (*Maraziti, Falcon & Healey,* attorneys) and *Daniel Gallagher* (*Miller & Gallagher,* attorneys) for defendant City of Wildwood.

WINKELSTEIN, J.A.D. (retired and temporarily assigned on recall).

This is an inverse condemnation action that came before the court for trial on February 14 and February 15, 2011. Plaintiff, Dock Street Seafood, Inc. (Dock Street), is a property owner in the City of Wildwood's (the city) redevelopment area. Plaintiff, through its principal, Richard A. Hoff, claims that the city mishandled the redevelopment project, imposing an eight year moratorium on private development in the redevelopment area. Plaintiff argues that as a result, it lost the potential sale of its land, and seeks a judgment that the city has inversely condemned the property. The city refutes plaintiff's allegations, and asserts that neither the redevelopment plan itself nor any action taken by the city to implement the plan implicitly or explicitly prohibited plaintiff from selling or otherwise developing its property. Consequently, the city argues that plaintiff has not proved that the city's actions have inversely taken plaintiff's property. Based on the trial evidence, I agree with the city and, accordingly, for the reasons that follow, enter judgment in favor of the city and dismiss plaintiff's complaint.

## I.

Plaintiff owns block 100, lots 30–40, known as 600 West Baker Avenue, located in the city's Bayside Redevelopment area (the redevelopment area). Plaintiff also owns seven adjacent lots, block 100, lots 14–20, known as 601 West Montgomery Avenue; this property is not in the redevelopment area. Plaintiff purchased the Montgomery Avenue property in 1981 and the Baker Avenue property sometime in 1991. Plaintiff paid between $73,000 and $78,000 for the Baker Avenue property.

On the Montgomery Avenue property, Dock Street operated a seafood business. Included on the property was a large freezer used in conjunction with its business. Plaintiff purchased the Baker Avenue property to serve as a buffer between the restau-

rant and the neighboring properties and because the property seemed to be a "good investment at the time."

On June 14, 2002, the Wildwood City Commission (the city commission) adopted resolution 209-6-02, which created the Bayside Redevelopment area and designated it as an "area in need of redevelopment" pursuant to *N.J.S.A.* 40A:12A-5. On September 25, 2002, by ordinance 575-02, the city adopted the "Bayside Area Redevelopment Plan (the redevelopment plan or the plan)," which set forth a conceptual plan for the redevelopment of the redevelopment area. Approximately seventy-eight percent of the redevelopment area was owned by the city and/or New Jersey Transit. A substantial portion of the area owned by the city consists of land that was formerly the site of the city's landfill. There are nineteen private properties included in the redevelopment area, including the Dock Street properties on Baker Avenue.

The redevelopment plan calls for the city to enter into an agreement with a qualified developer, or developers, to carry out the plan. The plan provides that the city could consider applications from more than one redeveloper. Section 12 of the plan, sub-section (a), captioned "Implementation, Approval Procedures and Other Requirements," provides that the city may solicit qualified developers, and sign a redevelopment agreement detailing the redeveloper's and the city's responsibilities.

The plan includes the following provision:

In considering whether and/or on what circumstances to enter into a redeveloper agreement with more than one party, the City or Redevelopment Agency, charged with the responsibility to achieve implementation of the Redevelopment Plan, will require that the development is coordinated in terms of architecture and other design and landscaping requirements, and/or guidelines, to insure consistent appearance of the project, and to maximize the success of the marketability of the project, and can be expected to be operated and maintained in a uniform manner.

The City may consider applications for redeveloper designation by local property owners who seek to undertake responsibility to implement the development on the property they presently own, where it is possible under the terms of this Plan to do so. Criteria for evaluating proposed redevelopment plans on specific properties and the eligibility of properties in general, shall be established to insure the uniform appearance and marketability of the entire redevelopment area.

According to the testimony of Louis Ferrara, the city's director of development, after the city solicited proposals from multiple developers it selected the proposal from K. Hovnanian Shore Acquisitions, LLC (Hovnanian), naming it the developer. In furtherance of that selection, on October 18, 2003, the city commission adopted resolution 363–10–03, which authorized the city to enter into a memorandum of understanding (MOU) with Hovnanian. The MOU was not a redevelopment agreement, but it provided an outline for the negotiation of a redevelopment agreement that would set forth a schedule for the acquisition of property and completion of the redevelopment area. The MOU was considered a starting point, not the ultimate redevelopment agreement, between the city and Hovnanian. The MOU provided in part: "this MOU shall remain in full force and effect until the execution of the redevelopment agreement, which shall incorporate the terms and conditions of the MOU." The MOU said that the parties were to use their best good faith efforts to execute the redevelopment agreement by February 2, 2004.

The MOU gave Hovnanian the opportunity to determine which, if any, of the privately owned properties in the redevelopment area would be included in the redevelopment project. The MOU further provided that Hovnanian would seek to acquire any privately owned properties it wanted to include in the plan by voluntary negotiations with the property owners, as the city did not intend to exercise its powers of eminent domain to acquire private property for the project. The MOU said that the city would not be compelled to condemn a property even if Hovnanian's negotiations for the property failed.

The MOU provided an outline for the redevelopment area. The project site was to include, "but not be limited to, the closure of the former landfill and remediation of any contamination on the Project Site, funding the relocation and construction of a new Public Works Facility, the construction of two hundred twenty (220) residential homes, a public walkway and fishing piers, the construction and/or repair of necessary bulkheading[.]"

In 2004 and 2005, the city and Hovnanian continued to negotiate the potential redevelopment agreement. In a contract dated September 14, 2005, the city agreed to convey to Hovnanian the city's property in the redevelopment area for $2.5 million. Although the MOU said that the city could unilaterally terminate the MOU if a redevelopment agreement was not executed by May 1, 2004, the city chose not to terminate the agreement, and on September 15, 2006, the city and Hovnanian entered into an amendment to the MOU.

The city and Hovnanian never executed a redevelopment agreement. The execution of the agreement was delayed by environmental and engineering issues and the decline in the housing market both nationally and in southern New Jersey. Ultimately, on November 21, 2007, Hovnanian's attorney wrote a letter to the city's mayor, Ernest Troiano, informing the city that Hovnanian withdrew and terminated its designation as redeveloper. The letter explained why Hovnanian terminated the agreement. It said:

significant environmental and engineering issues have made pursuit of this development decreasingly feasible in economic terms. Unfortunately, the state of the housing market (not only in South Jersey, but throughout New Jersey and the rest of the country), prevents us from investing additional time and funds to move forward with this challenging and potentially exciting development.

By the time Hovnanian withdrew as developer, it had expended $6.9 million in environmental and other costs in pursuing the project.

After Hovnanian terminated its redeveloper status, the city continued to look for a successor. The city had subsequent contact with an entity known as SLRD Co–Mullica Hill, LLC, and on September 23, 2008, agreed to sell its property in the redevelopment area to that entity and designated the company as the redeveloper for the property. The agreement between the city and SLRD provided that "the redeveloper may desire to include certain private properties located in the Bayside Redevelopment area in the project. Redeveloper may acquire said private properties at its expense by voluntary negotiations with said private

property owners." The agreement provided that although the redeveloper could request the city to exercise its eminent domain powers, the city would not be compelled to do so. The agreement further provided that at any time, the city could elect to designate up to four individual property owners within the redevelopment area as redevelopers of their own parcels. If that occurred, SLRD would have no rights to those parcels.

Soon after signing, SLRD terminated the agreement. According to Ferrara's testimony, SLRD lost its funding; SLRD could not come up with the deposit monies to purchase the property from the city. SLRD had experience in developing landfills, and Ferrara testified that SLRD's termination of the agreement was not related to environmental problems.

The city continued to seek alternate developers for the area. Consequently, it determined to use the land for solar generation and exclude residential uses from the landfill property. At the time of the trial, the city was preparing requests for proposals to seek a new developer for the new use.

## II.

Dock Street has paid and continues to pay taxes on its property in the redevelopment area. Dock Street has never appealed the city's designation of its property as being "in need of development," and has never appealed its tax assessment. Dock Street has never sought to redevelop its own property. It has never submitted a subdivision plan, a variance application, or a CAFRA application, nor has it ever applied for a building permit for the property.

Hoff, the owner of Dock Street, testified that he did not recall receiving any notices of the redevelopment plan until he received a certified letter advising him of a meeting at the fire hall to discuss the redevelopment area. He was unsure as to the date of the letter and whether the meeting was a meeting of a governmental body, such as the city's governing body or the planning board. The speaker he recalls at the meeting was Ernest Troiano, who

was at that time a city commissioner, and later became the mayor. Hoff and Troiano had known each other for many years, both serving as volunteer firefighters.

According to Hoff, Troiano told the attendees at the meeting that the city did not intend to take anyone's property by eminent domain, and the discussion was limited to the property on which the city dump had been located. Hoff did not recall Troiano or any else who spoke at the meeting indicating that any private property would be included in the redevelopment area. According to Hoff, it was not until the Hovnanian plan was presented at a city council meeting that he learned that his property was included in the development area. Hoff said that he never received a letter to that effect prior to the presentation of Hovnanian's plan.

Hoff further testified that he spoke to Troiano informally on multiple occasions, both at the firehouse and at city hall, about whether Hoff could sell or otherwise develop his property. According to Hoff, Troiano told him that Hovnanian was the redeveloper, and Hoff would have to go along with the plan. Hoff testified that Troiano told him that the city would not issue him a building permit; that building permits would only be issued to Hovnanian. Hoff indicated that Troiano never told him that he, Hoff, could opt out of the plan.

Troiano disputed Hoff's allegations. According to Troiano, the city sent a letter to affected property owners asking if they wanted to be in the redevelopment area. If the owners did not respond, their properties were placed in the redevelopment area. If they were in the redevelopment area, and Hovnanian wanted to develop the property, Hovnanian had to buy the property from the property owners, as the city did not intend to condemn the properties.

Further, Troiano testified that he may have spoken at the fire hall meeting, but he did not specifically recall what he said. He testified, however, that it was his understanding that if the property owners did not opt out of the redevelopment project at the beginning of the project, the property owner would "have to

live with it." Troiano testified that he did not tell Hoff what to do, but only told him his opinion of the consequences of not initially opting out of the project.

Michael Gentile is an owner of Mikalu LLC, one of the original plaintiffs in this law suit, which settled with the city. Mikalu had received planning board approval for a six-unit condominium development in the redevelopment area. Gentile testified at trial that he was unable to obtain a building permit for the development. He said when he spoke to an official of the Joint Construction Office, which is responsible for issuing the permits, he was told that no permits would be issued for properties in the redevelopment area. As part of the settlement, Mikalu was permitted to develop its property.

Gentile further testified that he had been aware that his property was in the redevelopment area, having received a certified letter to that effect sometime in May 2002. He testified that he "disposed" of the letter when he received it; he threw it in the trash. May 2002 was before the city's formal action adopting the redevelopment plan.

Hoff testified that he was presented with an agreement of sale for his Dock Street properties dated November 30, 2005. The agreement covered not only the property in the redevelopment area, but all of plaintiff's property, including property not located in the redevelopment area. The purchase price in the agreement was $5.4 million. The agreement had a number of contingencies. It contained a mortgage financing contingency in the amount of $4.32 million; it was contingent upon the buyer obtaining all necessary governmental approvals to build a mid-sized residential condominium project. Approvals necessary included site-plan approval, variance approval, CAFRA approval, water and sewer extensions, if applicable, building permits and hookups. As the agreement noted that the properties were situated in the city's redevelopment area, plaintiff agreed to obtain a "non-interest letter from K. Hovnanian and the city of Wildwood."

Hoff never signed the agreement of sale. When questioned about obtaining the letter of non-interest, he testified that he never contacted Hovnanian. He believed his attorney discussed the letter of non-interest with the city, but Hoff was not present at the meeting. He testified that he met with Troiano, but Hoff was unsure if he even told Troiano about the $5 million purchase price. Nor did Hoff show Troiano the agreement of sale.

On April 17, 2006, Hovnanian notified Dock Street's attorney by letter that it "has determined that [Dock Street's] property is needed for Hovnanian's proposed activities in the redevelopment area consistent with the city's approved redevelopment plan...." The letter further stated that "New Jersey law requires that the appraised value, for condemnation purposes, be determined as of the date the city adopted the redevelopment plan (August 14, 2002)."

The letter included an appraisal of the plaintiff's property dated March 7, 2006, valuing plaintiff's property at $220,000 as of the August 14, 2002 date. Hovnanian offered to purchase plaintiff's property for $660,000, three times the appraised value. The purchase offer was contingent upon (1) a forty-five day due diligence period; and (2) Hovnanian's obtaining all governmental approvals within two years of the signing of an agreement of sale. If Hovnanian needed an additional year to obtain those approvals, it was required to pay plaintiff an additional $33,000 deposit, on top of the original $66,000 deposit Hovnanian would pay to plaintiff upon the signing of the sales agreement. In a letter dated June 8, 2006, Dock Street rejected Hovnanian's offer.

III.

A municipality's power to exercise its redevelopment and reha-bilitation function is governed by the Local Redevelopment and Housing Law. *N.J.S.A.* 40A:12A-1 to -49. The Eminent Domain Act governs all condemnation actions, *N.J.S.A.* 20:3-5, including inverse condemnations. *Schiavone Constr. Co. v. Hackensack Meadowlands Dev. Comm'n,* 98 *N.J.* 258, 265, 486 *A.*2d 330 (1985).

Properties in need of redevelopment, which have previously been deemed "blighted areas," are subject to the Eminent Domain Act. *See N.J.S.A.* 40A:12A–6c; *N.J.S.A.* 20:3–1 to –50; *N.J. Const.* art. VIII, § 3, ¶ 1. A municipality's power to exercise its redevelopment or rehabilitation functions includes ordering a preliminary study, determining whether an area is in need of redevelopment, adopting a redevelopment plan, and determining whether an area is in need of rehabilitation. *N.J.S.A.* 40A:12A–4a(1), (2), (3), (4).

Before a municipality may designate an area in need of redevelopment, the matter is referred to the planning board to investigate whether the area meets the criteria set forth in *N.J.S.A.* 40A:12A–5. *N.J.S.A.* 40A:12A–6. Following notice to the public, the planning board holds a hearing, and reports back to the governing body whether the area should be designated as a redevelopment area. *N.J.S.A.* 40A:12A–6b(5). The planning board's "determination, if supported by substantial evidence . . . shall be binding and conclusive upon all persons affected by the determination." *Ibid.*

■ If a local government adopts a redevelopment plan, the local government or its designated redeveloper may acquire property by condemnation pursuant to the Eminent Domain Act; it may also contract with redevelopers, relocate businesses or residents displaced by the plan, and generally may do "all things necessary or convenient to carry out its powers." *N.J.S.A.* 40A:12A–8n; *see generally N.J.S.A.* 40A:12A–8c, d, e, f, i; *N.J.S.A.* 40A:12A–8j(1), (2). Property may be condemned and/or transferred for redevelopment to a private entity as long as the acquisition of the property is deemed to be for a public purpose. *Wilson v. City of Long Branch,* 27 *N.J.* 360, 376, 142 *A.2d* 837, *cert. denied,* 358 *U.S.* 873, 79 *S.Ct.* 113, 3 *L.Ed.2d.* 104 (1958).

■ A municipal ordinance is presumed valid. *Quick Chek Food Stores v. Twp. of Springfield,* 83 *N.J.* 438, 447, 416 *A.2d* 840 (1980). An entity challenging a municipal ordinance bears a "heavy burden" to show that the ordinance is arbitrary, capricious, or unreasonable. *Bryant v. City of Atlantic City,* 309 *N.J.Super.* 596, 610, 707 *A.2d* 1072 (App.Div.1998). These same consider-

ations apply when reviewing a local government's designation of an area to be in need of redevelopment. *Levin v. Twp. Comm. of Bridgewater*, 57 *N.J.* 506, 537, 274 *A.*2d 1, *appeal dismissed*, 404 *U.S.* 803, 92 *S.Ct.* 58, 30 *L.Ed.*2d. 35 (1971); *Concerned Citizens of Princeton, Inc. v. Mayor & Council of Princeton*, 370 *N.J.Super.* 429, 452–53, 851 *A.*2d 685 (App.Div.), *certif. denied*, 182 *N.J.* 139, 861 *A.*2d 844 (2004).

"In an inverse condemnation action, a landowner is seeking compensation for a *de facto* taking of his or her property." *Greenway Dev. Co. v. Borough of Paramus*, 163 *N.J.* 546, 553, 750 *A.*2d 764 (2000). To establish an inverse condemnation, requires the plaintiff to demonstrate that the governmental action destroyed all beneficial use of the plaintiff's property. *Washington Mkt. Enters. v. City of Trenton*, 68 *N.J.* 107, 118, 343 *A.*2d 408 (1975). A plaintiff must demonstrate, by clear and convincing evidence that a taking has occurred. *In re Egg Harbor Assocs.*, 94 *N.J.* 358, 374, 464 *A.*2d 1115 (1983), *superseded by statute on other grounds, see Holmdel Builders Ass'n v. Twp. of Holmdel*, 232 *N.J.Super.* 182, 200 n. 6, 556 *A.*2d 1236 (App.Div.1989); *Helmsley v. Borough of Fort Lee*, 78 *N.J.* 200, 218, 394 *A.*2d 65 (1978), *appeal dismissed*, 440 *U.S.* 978, 99 *S.Ct.* 1782, 60 *L.Ed.*2d 237 (1979). The court "cannot deny an owner all economically viable use of the land." *Gardner v. N.J. Pinelands Comm'n*, 125 *N.J.* 193, 205, 593 *A.*2d 251 (1991).

Nonetheless, not every impairment in property value establishes a taking. *Karam v. Dep't of Envtl. Prot.*, 308 *N.J.Super.* 225, 235, 705 *A.*2d 1221 (App.Div.1998), *aff'd*, 157 *N.J.* 187, 723 *A.*2d 943, *cert. denied*, 528 *U.S.* 814, 120 *S.Ct.* 51, 145 *L.Ed.*2d 45 (1999). Just because a government plans to take a property, its plans alone ordinarily do not constitute such a taking. *Littman v. Gimello*, 115 *N.J.* 154, 161–62, 557 *A.*2d 314, *cert. denied*, 493 *U.S.* 934, 110 *S.Ct.* 324, 107 *L.Ed.*2d 314 (1989). Thus, simple planning in anticipation of a condemnation, without physical appropriation or interference, does not constitute a taking. *Id.* at 162, 557 *A.*2d 314. Nor do lost economic opportunities occasioned by a pre-

taking government activity constitute a compensable taking. *Id.* at 162–63, 557 *A.*2d 314. To constitute a taking, supplemental action must "substantially destroy[ ] the beneficial use of private property." *Id.* at 164, 557 *A.*2d 314 (quoting *Schiavone Constr. Co., supra,* 98 *N.J.* at 263, 486 *A.*2d 330); *see also Gardner, supra,* 125 *N.J.* at 210, 593 *A.*2d 251 ("[I]mpairment of the marketability of the land," by itself, is not a taking).

## IV.

Applying the law to the evidence, I conclude that Dock Street has not proved, by clear and convincing evidence, that the city, in designating the Dock Street property as an area in need of redevelopment and attempting to redevelop the area, destroyed all of Dock Street's beneficial use of its property.

Initially, it is undisputed that plaintiff failed to appeal the city's June 14, 2002, resolution determining the area to be in need of redevelopment. Nor did plaintiff appeal from the adoption by the city of ordinance number 575–02, on September 25, 2002, establishing the redevelopment plan. Although Hoff testified that he did not recall receiving notice of either the resolution or the ordinance, resolutions and ordinances adopted by municipal agencies have a presumption of validity. *Witt v. Borough of Maywood,* 328 *N.J.Super.* 432, 442, 746 *A.*2d 73 (Law Div.1998), *aff'd,* 328 *N.J.Super.* 343, 746 *A.*2d 25 (App.Div.2000). Plaintiff did not appeal from the blight determination or the adoption of the redevelopment plan based on a lack of notice or for any other reason. Plaintiff has submitted no credible evidence from which I can reasonably infer that the city failed to comply with the appropriate notice requirements in either the adoption of the blight resolution or the ordinance adopting the plan.

Indeed, there was testimony by Gentile that he did, in fact, receive a notice prior to the adoption of the redevelopment plan, but he threw that notice in the trash. In that Gentile received the notice, and for the reasons set forth above, I reject plaintiff's

assertions that the city failed to provide plaintiff with the required statutory notices.

One of Hoff's primary arguments is that he was never aware that he could redevelop the property himself, and in fact was told by city officials that he could not do so. Hoff testified that the official in charge of issuing building permits told him that the mayor did not want any building permits issued in the redevelopment area unless they were issued to Hovnanian. Hoff further testified that Troiano, who was the mayor, told him to not even bother to apply to redevelop the property if he had not done so when the redevelopment plan was first proposed. As a result of these discussions and a discussion with at least one other property owner who had similar experiences with city officials, Hoff never took any formal steps to seek to redevelop his properties; he had no plans prepared; he made no applications for site plan approval; for CAFRA approvals; or for any type of redevelopment approvals or for a building permit.

■ I conclude that these informal discussions with individual municipal officials did not meet plaintiff's obligation to exhaust its administrative remedies in seeking to redevelop the property. Though plaintiff claims that it would have been futile to file a formal development application, "the so-called doctrine of futility as an exception to the doctrine of exhaustion of administrative remedies ... does not come into play before an applicant for administrative permission even files the request, at least not where the agency has some discretion to grant that request." *United Sav. Bank v. State*, 360 *N.J.Super.* 520, 526, 823 *A.2d* 873 (App.Div.), *certif. denied*, 177 *N.J.* 574, 832 *A.2d* 324 (2003). In this regard, "[p]reliminary statements from administrative officials ... even if appearing conclusive, are just that—preliminary. ... [A] landowner must give the land-use authority an opportunity to exercise its discretion." *Ibid.; cf. Local 189, United Papermakers & Paperworkers v. United States*, 416 *F*.2d 980, 997 (5th Cir.1969) (preliminary statements of government officials insufficient to constitute interpretation of government regulation, which can be

established only by formal opinion letter of general counsel), *cert. denied*, 397 *U.S.* 919, 90 *S.Ct.* 926, 25 *L.Ed.*2d 100 (1970).

Generally, municipal governments can only act by adoption of an ordinance or resolution at a public meeting. *City of Jersey City v. Roosevelt Stadium Marina, Inc.*, 210 *N.J.Super.* 315, 327, 509 *A.*2d 808 (App.Div.1986), *certif. denied*, 110 *N.J.* 152, 540 *A.*2d 156 (1988). Here, plaintiff did not give governmental agencies an opportunity to act on any proposed redevelopment plans for the property. Indeed, plaintiff did not have any. Hoff based his decision not to move forward and apply to develop his property primarily on informal conversations with the city's mayor. That is simply not sufficient. Without some type of formal application it is unknown if the city government, when faced with plaintiff's proposed application for redevelopment, would have approved that application. Plaintiff's failure to proceed with an application to redevelop its own property defeats plaintiff's argument that it was denied all beneficial use of the property.

Although Hoff questions whether plaintiff had the ability to opt out of the plan, in other words, to redevelop the property itself, section 12 of the redevelopment plan gave plaintiff that opportunity. It requires, however, some action on plaintiff's part, more than just informally speaking to the mayor and the construction official. The plan says that the city may consider applications for redeveloper designation by local property owners "who seek to undertake the responsibility to implement the redevelopment on property they presently own, where it is possible under the terms of this Plan to do so." The plan says that the property owners' "site plan and building designs ... must be consistent with those of either Alternate in this Plan." In other words, if a property owner submits its own plans, the city would consider them. Plaintiff failed to submit its own plans and the city was denied that opportunity.

There are additional reasons plaintiff has not met its burden of proof. Plaintiff paid somewhere between $73,500 and $78,000 for the property that is subject to the redevelopment plan. Plaintiff

still uses the property for the same purposes it used the property when it was purchased, that is, to act as a buffer between plaintiff's restaurant business and the surrounding properties. Hovnanian offered plaintiff $660,000 for the property, three times Hovnanian's appraised value of $220,000, and roughly eight times what plaintiff paid for the property. And plaintiff has not proved that the property included in the redevelopment area is worth more than the $660,000 offered by Hovnanian.

In that regard, plaintiff testified that he was presented with an agreement of sale for his property in November 2005, which covered not only the redevelopment property, but also the property not located in the redevelopment area. Plaintiff asserts that the $5.4 million purchase price establishes that the property was worth well in excess of the $660,000 offered by Hovnanian.

I reject that argument. Plaintiff never signed the agreement of sale. The agreement included property outside of the redevelopment area. The agreement had a number of contingencies, including mortgage financing in the amount of $4.32 million; it was contingent upon buyer obtaining all necessary government approvals to build a mid-sized residential condominium project, which approvals included site-plan approval, variance approval, CAFRA approval, water and sewer extensions, if applicable, building permits and hookups. And, because some of the lots were situated in the city's redevelopment area, plaintiff agreed to obtain a non-interest letter from Hovnanian and the city, which plaintiff never sought to obtain. Given this factual background, I place no weight on the $5.4 million purchase price in the proposed agreement of sale. Put simply, plaintiff has not established that the $660,000 offer by Hovnanian was not fair compensation for the property plaintiff owned that was located in the redevelopment area.

Plaintiff also claims that the city has deprived it of the beneficial use of its property because it has been over eight years since the redevelopment plan has been adopted, and the redevelopment area remains undeveloped. I reject that argument also. I find that following the adoption of the redevelopment plan in 2002, the

city has diligently attempted to have the area developed. The city sought multiple proposals from parties interested in being designated the developer; it entered into a series of memoranda of understanding with Hovnanian, a nationally recognized developer, to have the development accomplished.

I am mindful that environmental and other hurdles slowed the progress of the redevelopment plan. Nonetheless, Hovnanian spent almost $7 million on engineering and other professional fees to address the environmental issues to keep the project moving forward. I accept the testimony of Ferrara and other witnesses from the city that the environmental issues, while daunting, were not sufficient in and of themselves to defeat the plan. Rather, as is set forth in the November 21, 2007 letter Hovnanian's attorney wrote to the city, it was not simply the environmental and engineering issues that made pursuit of the development "decreasingly feasible in economic terms," but also the state of the housing market. While the city anticipated environmental problems, having had environmental surveys of the property done before the redevelopment plan was adopted, the city did not anticipate, and could not have been expected to anticipate, the downturn in the housing market both locally and nationally, which had such a significant effect on making the project uneconomical for Hovnanian.

I conclude that the adoption of the redevelopment plan has not significantly interfered with plaintiff's property rights. Though the redevelopment plan may have some adverse effect upon the properties located in the redevelopment area, the plan, akin to zoning restrictions that regulate the use of land, does not deny plaintiff all beneficial use of its property and consequently is not a taking in the constitutional sense. As already indicated, the diminution of land or its impairment of marketability does not itself amount to a taking. *Gardner, supra,* 125 *N.J.* at 210, 593 *A.*2d 251. And here, as a result of the provision in the redevelopment plan that allowed the property owners to become their own redevelopers, plaintiff continued to have the right to use its

property as it had in the past, and in fact had the right to develop its property for future uses. Because plaintiff failed to make any formal application for redevelopment of its property, plaintiff simply did not take advantage of that right.

In sum, plaintiff has failed to demonstrate that governmental action has destroyed all beneficial use of its property located in the redevelopment zone. Plaintiff has not shown substantial destruction of the value of its property, and consequently, has not proved by clear and convincing evidence that the city's actions, or inactions, constitute an inverse condemnation of plaintiff's property.

Accordingly, the court enters judgment in favor of defendant and dismisses plaintiff's complaint. An order is attached.

---

The following supplemental letter opinion was sent to the Appellate Division Clerk and counsel, *R.* 2:5-1(b), on May 23, 2011:

Although I have no additional findings to add to my written opinion, I wanted to make the court aware of an Appellate Division decision that was approved for publication on April 15, 2011, two weeks after my opinion. The decision directly addresses an issue that I addressed in my opinion—that is, the plaintiff's failure to exhaust administrative remedies. In *Rezem Family Assocs., LP, v. Borough of Millstone,* 423 *N.J.Super.* 103, 118, 30 *A.*3d 1061 (App.Div.), *certif. denied,* 208 *N.J.* 368, 29 *A.*3d 740 (2011), the panel discussed the plaintiff's failure to exhaust available administrative remedies as being grounds for a dismissal of its complaint. The court held that

whether we describe the applicable principle as exhaustion of remedies, ripeness of the claim, or the "finality rule," as defendants characterize it, we hold that plaintiff's substantive due process claims in a land use case require a showing either that plaintiff has obtained a final decision under available state procedures or that such an attempt would have been futile.

[*Ibid.*]

I would ask that the court consider the *Rezem* analysis in evaluating the appropriateness of my conclusion, at page eighteen

of my opinion, that the plaintiff's informal discussions with individual municipal officials did not meet the plaintiff's obligation to exhaust its administrative remedies in seeking to redevelop the property in that it denied the city an opportunity to act on any proposed redevelopment application. In other words, I concluded that the plaintiff's failure to proceed with an application to redevelop its property defeated its argument that it was denied all beneficial use of the property.